FILED
U.S. DISTRICT COURT

2007 MAY 15  P 3: 07

DISTRICT OF UTAH

BY: _____
        DEPUTY CLERK

FREDERICK R. THALER (7002)
JACQUELYN D. ROGERS (9062)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, Utah  84111
Telephone:  (801) 323-3358

JULIE I. UNGERMAN (Texas Bar No. 00791835)
SCOTT S. ROWEKAMP (Texas Bar No. 24027823)
**HUNTON & WILLIAMS LLP**
1601 Bryan Street, 30th Floor
Dallas, Texas 75201-3402
Telephone:  (214) 979-3000
(pro hac vice applications forthcoming)

Attorneys for Plaintiffs Circle Four LLC and Central Plains Farms, LLC

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | | |
|---|---|---|
| **CIRCLE FOUR LLC and CENTRAL PLAINS FARMS, LLC,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| **v.** | § | |
| | § | |
| **MORDECHAI ORIAN a/k/a MOTTY ORIAN; GLOBAL HORIZONS, INC. d/b/a AGRILABOR; PONGSATORN SANARUK; PHONGSAK KUNUNTHA; PHANUPHONG WONGWORN; PHANOM MONGKHONSAWAT; PRAWET PHANNARIT; SOMPHONG SRIYAP; SOMSAK WONGKAEO; WICHAI CHAROEN; MECHAI SAWONG; PRAYAD BUNPROM; SAYAN CHUAYTUA; EKACHAI PARIWANTANG; YOTRAK PHOTHIP; THANIT SRIBORAN; SOMSAK PHROMKHAN; CHALOEMCHAI PHOTHIWORN; NARONG** | § § § § § § § § § § § § § § § § | **COMPLAINT IN INTERPLEADER AND FOR DAMAGES**<br><br>Case: 2:07cv00320<br>Assigned To : Stewart, Ted<br>Assign. Date : 5/15/2007<br>Description: Circle Four et al v. Orian et al |

SRINONGKHOT; SOMSAK §
KHAEPHUTCHA; SUPPHASIT YASAKA, §
MANJA KHUNTHA; NARONGCHAI §
KHUMBUNGKLA; THAICHAN §
KONGTUNGMON; PHANUWAT §
JOMTHIP; ARUN PHANPON; ARWUTH §
LAINOK; CHAKKAPONG LAEBUA; §
SUWIT MIKEAO; ANURAT §
TRUATNOK; PRASIT SRI-ON; §
WATTHANA KAJIK; PRAPHAN §
MATAD; UTHAN KHLONGDEE; §
PHIROM KRINSOONGNOEN; AMNUAY §
PHAKONCHIM; PHIRAWAT §
NUANBUNMA; PHEERAPHONG §
SAISONG; DECHAWAT VONGTAR; §
CHAIYAKON PRACHOT; THONGPHAI §
NUANNGAM;  BUNTHAI SAREEWONG; §
CHUANGCHOT MUAD-OTTON; §
MONGHONSAK THANAKHUN; SAMRIT §
KORBPIMAI; CHAIRAT SRINAKRUNG; §
RADCHAWEE SUWANSING; PANID §
THARUPPACHIT; SAHARAT §
PRASERTSANG; WAIYAKORN §
CHIANWAPI; PRATEEP §
APICHATESKOL; CHANGCHUM §
THANONGSAK; AMPAI §
APICHATESKOL; THAWEEWAN §
TECHO; THIAN POTA; SEKSAN §
SOMMANAT; PHAIBUN MANISAENG; §
ANONT YINGTHAVORN; SAIAM §
RODPHAN; THANAPAT PIEDAENG; §
ANU KHONSINIT; AMORNTHEP §
THAPJANG; PRAYOON §
HONGSAMANUT; THANOKORN §
PHIADOENG; ANTHOM SUPHOM; §
PRAYUT CHAIPAYANT; SOMCHAI §
IAMSA-ARD; and PHICHET §
PHANTHASRI, §
                                                            §
                    *Defendants.*                           §

2

Circle Four LLC d/b/a Circle Four Farms ("Circle Four") and Central Plains Farms, LLC ("Central Plains") (collectively, "Plaintiffs") file this original complaint in interpleader and for damages against Mordechai Orian a/k/a Motty Orian ("Orian"), Global Horizons, Inc. d/b/a Agrilabor ("Global Horizons"). Plaintiffs also join, as defendants in the interpleader action, the following individual claimants: Pongsatorn Sanaruk, Phongsak Kununtha, Phanuphong Wongworn, Phanom Mongkhonsawat, Prawet Phannarit, Somphong Sriyap, Somsak Wongkaeo, Wichai Charoen, Mechai Sawong, Prayad Bunprom, Sayan Chuaytua, Ekachai Pariwantang, Yotrak Phothip, Thanit Sriboran, Somsak Phromkhan, Chaloemchai Phothiworn, Narong Srinongkhot, Somsak Khaephutcha, Supphasit Yasaka, Manja Khuntha, Narongchai Khumbungkla, Thaichan Kongtungmon, Phanuwat Jomthip, Arun Phanpon, Arwuth Lainok, Chakkapong Laebua, Suwit Mikeao, Anurat Truatnok, Prasit Sri-On, Watthana Kajik, Praphan Matad, Uthan Khlongdee, Phirom Krinsoongnoen, Amnuay Phakonchim, Phirawat Nuanbunma, Pheeraphong Saisong, Dechawat Vongtar, Chaiyakon Prachot, Thongphai Nuanngam, Bunthai Sareewong, Chuangchot Muad-Otton, Monghonsak Thanakhun, Samrit Korbpimai, Chairat Srinakrung, Radchawee Suwansing, Panid Tharuppachit, Saharat Prasertsang and Waiyakorn Chianwapi (collectively, the "Utah Claimaints"); and Prateep Apichateskol, Changchum Thanongsak, Ampai Apichateskol, Thaweewan Techo, Thian Pota, Seksan Sommanat, Phaibun Manisaeng, Anont Yingthavorn, Saiam Rodphan, Thanapat Piedaeng, Anu Khonsinit, Amornthep Thapjang, Prayoon Hongsamanut, Thanokorn Phiadoeng, Anthom Suphom, Prayut Chaipayant, Somchai Iamsa-Ard and Phichet Phanthasri (collectively, the "Colorado Claimants").

## Nature of the Action

1.  Plaintiffs bring this action in the nature of interpleader pursuant to 28 U.S.C. §§ 1335, 1397 and 2361, to determine the rights of adverse claimants who claim, or may claim, to be entitled to certain monies that defendant Global Horizons alleges are due and owing from Plaintiffs.  Specifically, Plaintiffs seek for the Court to resolve the adverse claims of Orian and Global Horizons on the one hand, and the Utah Claimants and Colorado Claimants on the other, and to determine the disposition of funds in the amount of $30,973.77 from Circle Four, and $5,990.91 from Central Plains—funds which both Plaintiffs stand ready and willing to pay. Plaintiffs believe the Utah Claimants and Colorado Claimants are ultimately entitled to receive some or all of these funds as wages for hours they have worked for their employer, Global Horizons.

2.  Plaintiffs also assert claims for damages against defendants Orian and Global Horizons, as set forth below.

## Jurisdiction and Venue

3.  The Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1335 because the funds that are the subject of the interpleader action exceed $500.00, and because the defendants include two or more adverse claimants of diverse citizenship who are claiming or may claim to be entitled to the funds.  The Court has diversity jurisdiction of the remaining claims pursuant to 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy exceeds $75,000.  The Court also has supplemental jurisdiction over the remaining

claims pursuant to 28 U.S.C. § 1367 because they are related to and arise from the same transactions or occurrences as the interpleader action.

4. This Court is a proper venue for this action pursuant to 28 U.S.C. § 1397 because one or more of the claimants reside in this judicial district.

### Parties and Service of Process

5. Circle Four is a Delaware limited liability company with its principal place of business in Beaver County and Iron County, Utah.

6. Central Plains is a Delaware limited liability company with its principal place of business in Yuma County, Colorado.

7. Global Horizons is a California corporation doing business in the State of Utah. It may be served with process by serving its registered agent, National Registered Agents, Inc., 395 West 2900 North, Pleasant Grove, Utah 84062.

8. Orian is a natural person who may be served with process at his place of business, 1111 Santa Monica Boulevard, Suite 1440, Los Angeles, California 90025, or wherever he may be found.

9. On information and belief, the Utah Claimants are each natural persons residing in the State of Utah, and they are each citizens of Thailand. The Utah Claimants each may be served at their place of residence in Beaver County.

10. On information and belief, the Colorado Claimants are each natural persons residing in the State of Colorado, and they are each citizens of Thailand. They may each be served with process at their place of residence in Yuma, Colorado, or wherever they may be found.

## General Factual Allegations

11.   Circle Four owns and operates a hog production farm in the State of Utah, and Central Plains owns and operates a hog production farm in the State of Colorado.

12.   On information and belief, Global Horizons was founded by Orian and he owns or controls all or a substantial majority of the company's shares of stock.   Orian is currently the President and Chief Strategic Officer of Global Horizons and he controls the company's day-to-day operations.   For example, in Plaintiffs' experience, Orian had final decisionmaking authority on all Global Horizons matters, and Global Horizons employees were not permitted to make any significant business decisions without Orian's express prior approval.

13.   In September 2005, Circle Four entered into an agreement with Global Horizons for Global Horizons to provide qualified and competent agricultural workers and supervisors for Circle Four's farming operations in Beaver County and Iron County, Utah ("Utah Farm").   In October 2005, Central Plains entered into a similar agreement with Global Horizons, for Global Horizons to provide qualified and competent agricultural workers and supervisors for its farming operations in Yuma County, Colorado ("Colorado Farm").

14.   With respect to both arrangements, Global Horizons and the Plaintiffs understood and agreed that the workers and supervisors would be employed, transported, housed, paid, trained and supervised by Global Horizons, and that Global Horizons would recruit some or all of the workers from foreign countries through the United States Department of Labor's H-2A visa program. Pursuant to the parties' agreements, Global Horizons did provide agricultural workers and supervisors for the Utah Farm and the Colorado Farm from time to time, beginning

6

in November 2005.   Global Horizons continued to provide such services to Plaintiffs until May

2007, when the events giving rise to this lawsuit occurred.

15.   In order to win and keep Plaintiffs' business, Orian made numerous representations

and promises to them, both prior to and after the execution of their written agreements.

Specifically, Orian made multiple representations about the ability of Global Horizons to employ

workers through the H-2A visa program, including but not limited to the following:

a.   Orian represented that Global Horizons was in compliance, and would remain in compliance, with all applicable federal, state and local laws and regulations necessary for Global Horizons to employ H-2A workers in the States of Utah and Colorado;

b.   Orian represented that Global Horizons held, and would continue to hold, a current United States Department of Labor Farm Contractor License, as well as all other licenses required by any state or federal agency for the employment of farm labor and for the transportation and housing of foreign agricultural workers;

c.   Orian represented that the housing Global Horizons would provide to its employees meets or exceeds all legal requirements, including the requirements of the H-2A visa program; and

d.   Orian represented that all of Global Horizon's employees were eligible to work in the United States.

On multiple occasions between September 2005 and April 2007, Orian repeated and affirmed

these and other representations and promises to Plaintiffs, and they were memorialized in written

agreements between Plaintiffs and Global Horizons.

16.   Orian also made multiple representations and promises to Plaintiffs about the

compensation Global Horizons would pay to its employees, including but not limited to Orian's

representations that Global Horizons would: (a) pay all wages, when due, to its employees; (b)

comply with all laws and regulations governing the payment of such wages; and (c) maintain

records detailing basis and amount of compensation paid to its employees.  In written agreements with Plaintiffs, Global Horizons affirmed Orian's representations and promises, and explicitly agreed to undertake and assume such obligations regarding payment of wages to its employees.

17.   The Utah Claimants and Colorado Claimants are citizens of Thailand who were brought to the United States and employed by Global Horizons through the H-2A visa program. Pursuant to the agreements between Plaintiffs and Global Horizons, each of the Utah Claimants and Colorado Claimants worked at the Utah Farm or Colorado Farm on one or more days in January-April 2007.

18.   In or around February 2007, Plaintiffs heard rumors that Global Horizons had not paid some of the wages to the Utah Claimants and Colorado Claimants that Global Horizons was obligated to pay them under state and federal law, and under the agreements with Plaintiffs. Plaintiffs' representatives contacted Orian to inquire about these rumors, and Orian represented that Global Horizons had timely paid all of its employees, and promised that Global Horizons would continue to do so.  Based on Orian's representations, Plaintiffs decided to continue their arrangements with Global Horizons for the Utah  and Colorado Claimants to perform farm labor services at the Utah and Colorado Farms.

19.   On or about April 18, 2007, nineteen Global Horizons employees did not show up for work at the Utah Farm.  Upon information and belief, the Global Horizons employees did not show up for work because Global Horizons had not paid them.  Circle Four immediately notified Global Horizons in writing that it was in breach of the parties' agreement, and requested that

Global Horizons provide certain information regarding the situation.  To date, Global Horizons has not responded to this request.

20.  On or about May 4, 2007, Circle Four received a letter from Hanz K. Grunauer, a Wage Hour Investigator at the United States Department of Labor ("DOL"), stating that he would be visiting Circle Four's offices on May 8, 2007 to investigate Circle Four's compliance with the Fair Labor Standards Act.  A true and correct copy of Mr. Grunauer's letter is attached as Exhibit A.

21.  As a result of the Global Horizons employees' failure to report to work and Mr. Grunauer's letter, Plaintiffs began looking into whether Global Horizons and Orian had complied with their obligations under the agreements with Plaintiffs and under applicable state and federal laws.  Plaintiffs were shocked to learn that on July 27, 2006, the DOL had issued a determination that *debarred* both Orian and Global Horizons for a period of three years—meaning that neither Orian nor Global Horizons are allowed to obtain H-2A temporary labor certifications during that time.  Plaintiffs also learned that the DOL's determination became a final Decision and Order of the Secretary of Labor on November 30, 2006, when an Administrative Law Judge, William Dorsey, denied a request by Global Horizons and Orian for a hearing to appeal the July 27 determination regarding their debarment.  True and correct copies of Judge Dorsey's November 30, 2006 Decision and Order, along with his December 26, 2006 Decision and Order denying a request for an emergency stay of the November 30 order, are collectively attached as Exhibit B.[1]

---

[1] Orian and Global Horizons have been unsuccessful in their subsequent attempts to have the order stayed.

22.  Plaintiffs also learned in May 2007, for the very first time, that Global Horizons does not have current temporary labor certifications that would allow it to employ H-2A workers Utah and Colorado.  Moreover, on May 11, 2007, with no prior notice, the Director of International Relations for Global Horizons sent an e-mail to Plaintiffs' representative, which stated that effective immediately, Global Horizons would no longer be able to provide its employees to perform farm labor services at either the Utah Farm or the Colorado Farm.

23.  Because of Global Horizons' actions and failure to respond to Circle Four's April 18, 2007 inquiry, Plaintiffs were forced to prohibit any Global Horizons employee from working at the Utah and Colorado Farms.

24.  Although the most recent written agreements between Plaintiffs and Global Horizons expired in May 2006, the parties had orally agreed to continue their arrangements based on the same terms and conditions while they engaged in negotiations concerning a new written agreement.  Accordingly, between May 2006 and May 2007, Global Horizons continued to employ agricultural workers and provide their services from time to time to Circle Four at the Utah Farm and to Central Plains at the Colorado Farm.

25.  Prior to learning about the events described above, the Plaintiffs had timely paid all invoices they received from Global Horizons.  Each invoice covered one week's worth of work by the Global Horizons employees at the Utah Farm or the Colorado Farm.  The compensation paid by Plaintiffs to Global Horizons was calculated based on: (i) the amount of wages due and owing to the Global Horizons employees for their work at the Utah Farm and the Colorado Farm plus an additional sum per hour (ranging between $1.00-$2.00/hour) for each hour worked by the

Global Horizons employees (the "Base Fee"); plus (ii) an additional surcharge of up to 40% of the Base Fee.

26.  To this day, neither Orian nor anyone else at Global Horizons has ever notified the Plaintiffs that they had been debarred by the DOL in a determination that became final on November 30, 2006, or that Global Horizons does not have the required state certifications to employ H-2A workers in Utah and Colorado.  Indeed, as recently as April 19 and May 3, 2007, Orian personally represented to Plaintiffs that Global Horizons had the ability to continue to provide its H-2A employees from Thailand to work on the farms.  In fact, on its *current* Agrilabor website, Global Horizons continues to represent to the public that it has the ability to procure H-2A visas for foreign workers.[2]

27.  As a result of this situation, Plaintiffs also learned that Global Horizons has failed and refused to pay the Utah Claimants, and the Colorado Claimants, for at least seven (7) weeks worth of work they duly performed for Global Horizons.

28.  On information and belief, Global Horizons has claimed to the Utah Claimants and Colorado Claimants that the reason they have not been paid for these seven (7) weeks of work is because Plaintiffs have not paid Global Horizons.  However, Plaintiffs have already timely paid, in full, all of the Global Horizons invoices they received for the past weeks of work by the Global Horizons employees—except for the final invoice from Global Horizons for the final

---

[2] For example, on its frequently-asked-questions or "FAQ" pages, Global Horizons claims it can "make it easy" for businesses to "benefit from the use of 'H2A'" because: "By administering all the paperwork themselves, GLOBAL goes through the certification process, finds, hires and brings into the USA the workers you need to do the job you require."  A true and correct copy of the Global Horizons FAQ page, which was printed from the Global Horizons website on May 15, 2007 (www.agrilabor.com), is attached as Exhibit C.

week of work by the Global Horizons employees at the Colorado Farm and Utah Farm, which

are the funds the Plaintiffs seek to interplead in this lawsuit.

### Request for interpleader relief

29.   Plaintiffs repeat and reallege each of the allegations contained in the foregoing

paragraphs as fully set forth herein.

30.  With respect to the interpleader action, Plaintiffs request the following relief:

a.  That the Court grant leave, pursuant to Rule 67 of the Federal Rules of Civil
Procedure and 28 U.S.C. § 1335(a)(2), for Circle Four and Central Plains to
deposit the sums of $30,973.77 and $5,990.91, respectively, into the registry of
the Court, there to remain until further order or judgment of the Court;

b.  That the Court, pursuant to 28 U.S.C. § 1335, enter an order of interpleader
and require the defendants to interplead and settle between themselves their rights
or claims to the funds;

c.   That the defendants, and each of them, be permanently enjoined from
instituting or prosecuting against Plaintiffs any proceeding in any state or United
States Court or administrative tribunal affecting the funds involved in the
interpleader action until further order or judgment of the Court, and that said
injunction issue without bond or surety;

d.  That Plaintiffs have no further liability to the defendants beyond their admitted
liability of $30,973.77 for Circle Four and $5,990.91 for Central Plains.

e.  That the Court award Plaintiffs their costs, including reasonable attorneys' fees
expended in bringing this action; and

f.  That the Court award all other legal or equitable relief to which Plaintiffs are
justly entitled.

### Causes of action against defendants Global Horizons, Inc. and Orian

### Breach of contract—Global Horizons, Inc.

31.   Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs as fully set forth herein.

32.   Plaintiffs have each performed their obligations under their respective agreements with Global Horizons, Inc.  The actions and omissions by Global Horizons constitute a breach of both agreements, and its breaches have caused injury to the Plaintiffs for which they seek an award of damages.  In addition, as a result of the breaches by Global Horizons, it has been necessary for Plaintiffs to retain legal counsel to prosecute this case, and Plaintiffs are entitled to recover their reasonable legal fees and costs.

33.  All conditions precedent to the recovery sought by Plaintiffs have been performed or occurred.

### Fraud and Fraudulent Inducement—Global Horizons, Inc. and Orian

34.   Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs as fully set forth herein

35.  Defendants Orian and Global Horizons each made false representations of existing material facts to the Plaintiffs, and they each also failed and refused to disclose material facts to the Plaintiffs, and the false representations and material omissions were made knowingly or recklessly.

36.  Defendants Orian and Global Horizons made such false representations and material omissions to the Plaintiffs for the purpose of inducing Plaintiffs' reliance thereon.  Plaintiffs did actually and justifiably rely on the false representations and material omissions to their detriment, and Plaintiffs' detrimental reliance has caused them to suffer injury.

13

## **Negligent Misrepresentation—Global Horizons, Inc. and Orian**

37.   Plaintiffs repeat and reallege each of the allegations contained in the foregoing paragraphs as fully set forth herein

38.   Defendants Orian and Global Horizons, in the course of their business or in the course of transactions in which they had a pecuniary interest, supplied false information for the guidance of Plaintiffs.  Neither Orian nor Global Horizons exercised reasonable care in obtaining or communicating the false information, and Plaintiffs each justifiably relied, to their detriment, on the false information supplied by Orian nor Global Horizons.   Plaintiffs' detrimental reliance has caused them to suffer injury.

## **Request for Relief**

39.   Plaintiffs request that the Court enter a judgment for the following:

a.  the interpleader relief described in paragraphs 28-29 above;

b.  recovery of their actual damages from Defendants Orian and Global Horizons;

c.  recovery of punitive damages against Defendants Orian and Global Horizons;

d.  recovery of their reasonable attorneys' fees and costs of court;

e.  recovery of pre-judgment and post-judgment interest at the maximum lawful rate; and

f.  all further relief to which they are justly entitled.

DATED this ___15th___ day of May, 2007.

RAY QUINNEY & NEBEKER P.C.


_____
Frederick R. Thaler
Jacquelyn D. Rogers
**RAY QUINNEY & NEBEKER P.C.**

Julie I. Ungerman
Scott S. Rowekamp
**HUNTON & WILLIAMS LLP**
1601 Bryan Street, 30th Floor
Dallas, Texas 75201-3402
(pro hac vice applications forthcoming)

**ATTORNEYS FOR PLAINTIFFS**
**CIRCLE FOUR LLC and**
**CENTRAL PLAINS FARMS, LLC**

Addresses of Plaintiffs:

Circle Four Farms
P.O. Box 100 (Physical Address: 341 South Main)
Milford, UT 84751

Murphy Brown of Yuma
806 W. 8th Ave
Yuma, CO 80759

927646

# Exhibit A

**U.S. Department of Labor**　　Employment Standards Administration
Wage and Hour Division
150 East Social Hall Ave., Suite 695
Salt Lake City, UT 84111
(801) 524-5097, ext. 201



DATE:　　April 30, 2007

TO:　　Circle Four Farms
PO Box 100
Milford, UT 84751

SUBJECT:　Visit by Wage Hour Investigator
Date:　05/08/07
Time:　1:00 pm
Place:　Establishment

The Wage and Hour Division of The United States Department of Labor is responsible for the administration and enforcement of a number of federal laws involving labor standards. These include the Fair Labor Standards Act, the Public Contract Act, the Service Contract Act, the Family Medical Leave Act and Title III, Consumer Credit Protection Act.  The Division also has certain responsibilities under the Davis-Bacon Act and related statutes, the Contract Work Hours and Safety Standards Act, and the Immigration Reform and Control Act of 1986.

This letter is to advise you that I will call at your establishment on the date and time shown above to determine compliance with the Fair Labor Standards Act. (This will also include other laws, as listed above, if any of these apply.)

Every effort will be made to conduct this assignment expeditiously and with a minimum of inconvenience to you and your employees. The authority for this investigation can be found in Section 2 of the Fair Labor Standards Act, which is available through our office.

Usually, the following steps are taken during a compliance review:

1. An opening conference is held with the employer or a designated representative

2. A tour of the establishment is made

3. Pertinent records are inspected to determine coverage, exemptions, and the status of compliance

4. A representative number of employees are interviewed

5. If necessary for completion of the investigation, the employer may be requested to make computations or transcriptions of records

6. A closing conference is held with a responsible official of the firm to review the results of the investigation.

SUBJECT:   Visit by Wage and Hour Investigator

The investigation will cover a two year period and I will need access to the following information on all employees, both current and former, for the investigative period (05/10/05 – 05/08/07):

1. Name, address, and telephone number
2. Social Security number
3. Job classification
4. Period of employment
5. Rate of pay
6. Hours worked each day and each workweek (i.e. timecards or similar documentation)
7. Straight-time and overtime earnings (i.e. payroll records or similar documentation)
8. Gross and net wages earned and paid
9. Deductions
10. Documentation showing the date of birth (birth certificate or similar documentation), the date of hire, and the occupation of any minor employee(s) (nineteen and under).
11. List of minor employees (under 18 years of age) employed for the two-year period.
12. Annual gross dollar volume done by your firm; this is usually found on quarterly state tax forms for the individual store. I also need the figures for the enterprise, any other establishments owned by the same individuals.
14. Documentation showing birth dates of your employees, other than the I-9 form.
15. Federal Employer Identification number.
16. Copies of current Federal Service Contracts with applicable wage determinations.

**NOTE: Please have a LIST ready which will include the first 5 items listed above.  Items 6 through 11 should be provided with the payroll records.**

In order to expedite this matter, I will need all of this information available at the time of the appointment shown above.   If you have questions, please call me at (801) 524-5097, extension 201.

Sincerely,


Hanz K. Grünauer
Wage Hour Investigator



# U.S. Department of Labor

**Employment Standards Administration**
**Wage and Hour Division**

## Fact Sheet #44: Visits to Employers

This Fact Sheet provides general information about the laws enforced by the Wage and Hour Division.

## Purpose of Visit

The Wage and Hour Division (WHD) is responsible for administering and enforcing a number of federal laws which set basic labor standards, among them:

- The Fair Labor Standards Act
- The Family and Medical Leave Act
- The Migrant and Seasonal Agricultural Worker Protection Act
- The field sanitation standards of the Occupational Safety and Health Act
- The Employee Polygraph Protection Act
- Certain employment standards and worker protections under the Immigration and Nationality Act
- Government contracts prevailing wage statutes such as the Davis-Bacon and related Acts and the McNamara-O'Hara Service Contract Act
- Garnishment provisions of the Consumer Credit Protection Act

An investigator from WHD may conduct an investigation to determine whether these laws apply to an employer. If the employer is subject to these laws, the investigator will verify that workers are paid and employed properly according to the laws administered, and that youths under age 18 are employed as provided by the child labor provisions. The WHD does not require an investigator to previously announce the scheduling of an investigation, although in many instances the investigator will advise an employer prior to opening the investigation. The investigator has sufficient latitude to initiate unannounced investigations in many cases in order to directly observe normal business operations and develop factual information quickly.

An investigator may also visit an employer to provide information about the application of, and compliance with, the labor laws administered by WHD.

## Why is an employer selected for an investigation?

The WHD conducts investigations for a number of reasons, all having to do with enforcement of the laws and assuring an employer's compliance. WHD does not typically disclose the reason for an investigation. Many are initiated by complaints. **All complaints are confidential; the name of the worker and the nature of the complaint are not disclosable; whether a complaint exists may not be disclosed.**

In addition to complaints, WHD selects certain types of businesses or industries for investigation. The WHD targets low-wage industries, for example, because of high rates of violations or egregious violations, the employment of vulnerable workers, or rapid changes in an industry such as growth or decline. Occasionally, a number of businesses in a specific geographic area will be examined. The objective of targeted investigations is to improve compliance with the laws in those businesses, industries, or localities. Regardless of the particular reason that prompted the investigation, all investigations are conducted in accordance with established policies and procedures.

## Investigation Procedures

Investigations may be conducted under any one or more of the laws enforced by WHD. Most employers are subject to the Fair Labor Standards Act (FLSA), which is the primary federal law of most general application requiring payment of the minimum wage and overtime premium pay, keeping certain basic payroll and employment records, and limiting the working hours and types of jobs for certain underage youths. The procedures described below for FLSA investigations are generally applicable to WHD investigations under other laws.

Section 11(a) of the FLSA authorizes representatives of the Department of Labor to investigate and gather data concerning wages, hours, and other employment practices; enter and inspect an employer's premises and records; and question employees to determine whether any person has violated any provision of the FLSA.

The WHD investigator will identify himself/herself and present official credentials. The investigator will explain the investigation process and the types of records required during the review.

An investigation consists of the following steps:

- Examination of records to determine which laws or exemptions apply. These records include, for example, those showing the employer's annual dollar volume of business transactions, involvement in interstate commerce, and work on government contracts. **Information from an employer's records will not be revealed to unauthorized persons.**
- Examination of payroll and time records, and taking notes or making transcriptions or photocopies essential to the investigation.
- Interviews with certain employees in private. The purpose of these interviews is to verify the employer's payroll and time records, to identify workers' particular duties in sufficient detail to decide which exemptions apply, if any, and to confirm that minors are legally employed. Interviews are normally conducted on the employer's premises. In some instances, present and former employees may be interviewed at their homes or by mail or telephone.
- When all the fact-finding steps have been completed, the investigator will ask to meet with the employer and/or a representative of the firm who has authority to reach decisions and commit the employer to corrective actions if violations have occurred. The employer will be told whether violations have occurred and, if so, what they are and how to correct them. If back wages are owed to employees because of minimum wage or overtime violations, the investigator will request payment of back wages and may ask the employer to compute the amounts due.

Employers may be represented by their accountants or attorneys at any point during this process. When the investigator has advised the employer of his/her findings, the employer or representative may present additional facts for consideration if violations were disclosed.

## What enforcement procedures and remedies are provided under the laws administered?

While every effort is made to resolve the issue of compliance and payment of back wages at an administrative level, the FLSA also provides for the following:

- An employee may file suit to recover back wages, and an equal amount in liquidated damages, plus attorney's fees and court costs.
- The Secretary of Labor may file suit on behalf of employees for back wages and an equal amount in liquidated damages.
- The Secretary may obtain a court injunction to restrain any person from violating the law, including unlawfully withholding proper minimum wage and overtime pay.
- Civil money penalties may be assessed for child labor violations and for repeat and/or willful violations of FLSA's minimum wage or overtime requirements.
- Employers who have willfully violated the law may face criminal penalties, including fines and imprisonment.
- Employees who have filed complaints or provided information during an investigation are

protected under the law. They may not be discriminated against or discharged for having done so. If they are, they may file a suit or the Secretary of Labor may file a suit on their behalf for relief, including reinstatement to their jobs and payment of wages lost plus monetary damages.

Many of the above provisions are found in other laws administered by WHD. For example, the Migrant and Seasonal Agricultural Worker Protection Act also provides for the assessment of civil money penalties, criminal sanctions, fines and imprisonment.

In the case of the government contracts statutes, contract funds may be withheld for violations under the Walsh-Healey Public Contracts Act, McNamara-O'Hara Service Contract Act, Davis-Bacon and Related Acts, and Contract Work Hours and Safety Standards Act. Administrative hearings or, in some cases, court action may be initiated to recover back pay under these laws. In addition, liquidated damages may be assessed for certain violations. Violators of these laws may also lose their Federal contracts and be declared ineligible for future contracts for a specified period.

## Additional Information

Additional information, including pamphlets and fact sheets on the various provisions administered by WHD, are available both electronically on the Internet and upon request from local WHD offices. Please visit WHD's Internet Web Site Home Page (at www.wagehour.dol.gov). An interactive advisor system designed to help employers and employees understand and comply with numerous employment laws enforced by DOL is available through *elaws* (*E*mployment *L*aws *A*ssistance for *W*orkers and *S*mall Businesses), accessed at www.dol.gov/elaws. DOL's Small Business Regulatory Compliance Assistance Page is also available by accessing the DOL Home Page at www.dol.gov. To find a listing of local WHD district office addresses and phone numbers, click on the "Contact Your Local Office" hot button from the WHD Home Page (www.wagehour.dol.gov), or call our toll-free information and helpline at 1-866-4USWAGE (1-866-487-9243). Under the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), small entities may comment on WHD enforcement by calling 1-888-REG-FAIR (1-888-734-3247), or writing to the Office of the National Ombudsman, U.S. Small Business Administration, 409 3rd Street, SW, MC2120, Washington, DC 20416-0005. The Ombudsman's website is http://www.sba.gov/ombudsman/. WHD does not consider the filing of a comment with the Ombudsman as a factor in determining how to resolve issues raised during a compliance action.

**This fact sheet is intended as general information only and does not carry the force of legal opinion.**

The Department of Labor is providing this information as a public service. This information and related materials are presented to give the public access to information on Department of Labor programs. You should be aware that, while we try to keep the information timely and accurate, there will often be a delay between official publications of the materials and the modification of these pages. Therefore, we make no express or implied guarantees. The *Federal* Register and the *Code of Federal Regulations* remain the official source for regulatory information published by the Department of Labor. We will make every effort to correct errors brought to our attention.

**U.S. Department of Labor**
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC 20210

1-866-4-USWAGE, TTY: 1-877-889-5627
**Contact Us**

# Exhibit B

**U.S. Department of Labor**

Office of Administrative Law Judges
50 Fremont Street - Suite 2100
San Francisco, CA 94105

(415) 744-6577
(415) 744-6569 (FAX)



**Issue Date: 30 November 2006**

Case No.: 2006-TLC-00013

*In the Matter of:*

GLOBAL HORIZONS, INC.,
GLOBAL HORIZONS MANPOWER, INC., and
MORDECHAI ORIAN, an individual,

RESPONDENTS.

*Appearances*:

       Barbara A. Matthews, Esquire
       Norman E. Garcia, Esquire
       Office of the Solicitor of Labor
       For the Administrator

       Mindy S. Novik, Esquire
       Dean A. Rocco, Esquire
       Jackson Lewis LLP
       For the Respondents

Before:       WILLIAM DORSEY
              Administrative Law Judge

### Decision and Order Dismissing Untimely Request for Hearing

    The parties have filed opening and supplemental arguments on the motion the Administrator of the Department's Office of Foreign Labor Certification, Employment and Training Administration, filed to dismiss the Respondents' request for hearing as untimely.[1] The Respondents' opposition to the dismissal includes exhibits and declarations, so the analysis is not confined to the Administrative Record the Department prepared.[2] I find that: (1) the request for hearing was filed late, (2) the doctrine of equitable tolling sets the standard for determining whether to accept it, and (3) the Respondents fail to satisfy that standard. The request for hearing

---

[1] The Order for Further Briefing entered on Oct. 4, 2006 asked the parties to broaden their research on the standard to be applied in deciding whether to accept a late filing.

[2] The certified copy of the administrative record the Department served, as 20 C.F.R. § 655.112(a)(1) (2006) requires, includes 157 pages.

is dismissed.  Dismissal makes the Department's July 27, 2006 Determination and Notice of Prospective Denial of Temporary Alien Agricultural Labor Certification for Three Years (the Determination Notice) the Secretary of Labor's final order.

> A.    *The Context: Congress Requires that H-2A Matters be Expedited*

Agricultural workers have been admitted temporarily (*i.e.*, as nonimmigrants) to the United States for over 50 years.  The H-2A visa program had its genesis in the Immigration and Nationality Act of 1952 (the Immigration Act).  Subparagraph (H)(ii) of Section 10l(a)(15) of the Immigration Act described an eligible foreign worker as:

> (H) an alien having a residence in a foreign country which he has
> no intention of abandoning . . . (ii) who is coming temporarily to
> the United States to perform temporary services or labor, if
> unemployed persons capable of performing such service or labor
> cannot be found in this country. 8 U.S.C.A. § 1101(a)(15)(H)(ii) .

A staff report prepared for the Committee on Education and Labor of the House of Representatives gave this summary of the objectives of the 1952 legislation:

> In creating the H-2 program, Congress attempted to address the
> problems that DOL had documented pertaining to wage depression
> and job displacement caused by foreign agricultural workers. An
> explicit intent of the law, therefore, was to reserve American jobs
> for American workers. Thus the H-2 program allowed the
> admission of nonimmigrant workers into the U.S. to perform
> temporary services only if willing, able and qualified U.S. workers
> could not be found. Further to offset the adverse impact of foreign
> labor on the domestic agricultural labor market, the regulations
> required H-2 agricultural employers to pay an enhanced wage rate,
> known as the "adverse effect wage rate." Staff of House Comm. on
> Education and Labor, 102d Cong., 1st Sess., Report on the Use of
> Temporary Foreign Workers in the Florida Sugar Cane Industry 3
> (Comm. Print 1991)

The Immigration Reform and Control Act of 1986 amended the 1952 Immigration Act to create a new category of temporary agricultural worker (designated an "H-2A" worker), defined as:

> (H) an alien . . . (ii)(A) having a residence in a foreign country
> which he has no intention of abandoning who is coming
> temporarily to the United States to perform agricultural labor or
> services, as defined by the Secretary of Labor . . . of a temporary or
> seasonal nature... 8 U.S.C.A. § 1101(a)(H)(ii)(A)

The House staff report gave this reason for the new category:

> In response to complaints by the agriculture industry that the H-2 program was too burdensome and inflexible to meet its labor needs, Congress amended the program in 1986 to create separate agricultural and non-agricultural temporary foreign worker programs . . . .  The new agricultural program is known as "H-2A," after the new subsection designation. The process of applying for temporary foreign workers has been greatly streamlined under the H-2A program. However, the amendment also has incorporated into the statute many of the protections for U.S. workers that previously had been established by regulation under the H-2 program. The H-2A statute continues to prohibit the admission of temporary foreign workers at wage rates or working conditions which will adversely affect similarly-employed United States workers. Report, *supra*, p.3, 4.

Today foreign nationals may be granted visas to work temporarily in the United States when there are not enough workers in this country who are able, willing, qualified and available at the time and place needed to perform agricultural labor or services.  8 U.S.C.A. §§1101 (a)(15)(H)(ii)(a), 1184(a), (c) (West 2005); 20 C.F.R. § 655.90(b)(1) (2006).  Employers who need the labor (or their agents, such as the Respondent Global Horizons, Inc.) petition for the H-2A visas that will admit these agricultural workers to the United States.  8 U.S.C.A. § 1184(b), (c)(1) (West 2005); 8 C.F.R. § 214.2(h)(1)(i) (2006).  Statements in the application and all interactions with the Department must be truthful. 29 C.F.R. § 501.7 (2006).[3]  The Secretary of Labor's regulations describe the process used to certify that qualified United States workers are unavailable for the jobs, and that the temporary employment of the foreign workers will not

---

[3] That H-2A program regulation emphasizes the candor requirement, stating:

"Information, statements and data submitted in compliance with provisions of the [Immigration] Act or these regulations are subject to title 18, section 1001, of the U.S. Code, which provides:

Section 1001. Statements or entries generally.

Whoever, in any matter within the jurisdiction of any department or  agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

adversely affect the wages[4] and working conditions[5] of similarly employed workers in that part of the United States. 8 C.F.R. § 214.2(h)(5)(ii); 20 C.F.R. §§ 655.90(b)-(d); 655.103.

The Secretary of Labor enforces both the attestations an employer makes in a temporary agricultural labor certification application, and the regulations that implement the H-2A program. 29 C.F.R. §§ 501.1, 501.5, 501.16 and 501.17 (2006). If foreign workers are paid sub-standard wages or subjected to sub-standard conditions, the market for farm laborers or services would prefer less costly temporary foreign workers, to the detriment of Americans.[6] False or fraudulent assurances about the jobs, wages or working conditions, or the failure to abide by program regulations may result in (1) monetary penalties imposed by the Department's Employment Standards Administration, (2) debarment from filing other H-2A certification applications imposed by the Employment and Training Administration, and (3) proceedings for specific performance, injunctive or other equitable relief in U.S. District Court. 20 C.F.R. §§ 655.103; 655.110 (2006); 29 C.F.R. § 501.19, 29 C.F.R. § 501.16 (c) and (d) (2006). The authority for these various enforcement strategies is found in 20 C.F.R. § 655.90(b)(2)(2)(A) and 29 C.F.R. §§ 501.15 and 501.16. The Immigration Act forbids the Secretary of Labor to certify an employer's H-2A application when:

> The employer during the previous two-year period employed H-2A workers and the Secretary of Labor has determined, after notice and opportunity for a hearing, that the employer at any time during that period substantially violated a material term or condition of the labor certification with respect to the employment of domestic or non-immigrant workers. 8 U.S.C.A. § 1188(b)(2)(A) (West 2005).

Temporary labor certifications require exceptionally swift handling so that farmers can harvest crops or breed farm and range animals as growing and breeding seasons dictate. *See generally*, 20 C.F.R. § 655.101(c), 64 Fed. Reg. 34957, 34961-34962. The employer may file an H-2A certification application just 45 days before the workers are needed. 8 U.S.C.A. § 1188(c)(1) (West 2005). The Department must tell the employer about any deficiencies in the application within seven days, and offer to let the employer make a "prompt resubmission of a

---

[4] See 20 C.F.R. § 655.107 (2006) on the mandate to pay prevailing wages, and how those wages are computed.

[5] The employer must arrange to house the temporary foreign workers; protect them from the economic consequences of job injuries with workers' compensation insurance; furnish necessary tools, meals, and transportation; guarantee the number of paid work days at the prevailing wage rates; pay the workers at frequent intervals; and keep records to demonstrate compliance with these requirements. 20 C.F.R. §§ 655.102(b)(1) through (14).

[6] Two examples — insurance and labor disputes — illustrate how the Immigration Act inhibits employers from gaining an advantage through hiring temporary foreign agricultural workers. The employer must provide insurance benefits to H-2A workers, for any injury or disease that arises out of and in the course of the employment, that are no less generous than the benefits state law requires for similar workers. 8 U.S.C.A § 1188(b)(3) (West 2005) and 20 C.F.R. § 655.102(b)(2) (2006). The employer also must attest that the jobs to be certified are not vacant because a former employee is on strike or is locked out in the course of a labor dispute. 8 U.S.C.A § 1188(b)(1) (West 2005) & 20 C.F.R. § 655.103(a) (2006).

modified application." 8 U.S.C.A. § 1188(c)(2)(A), (B) (West 2005).  The modifications must come within five calendar days.  20 C.F.R. §§ 655.101(c)(2); 655.104(c)(2) (2006).  The decision on the application (often denominated a Determination Notice) is due no fewer than 30 days before the employer says the workers are needed. 8 U.S.C.A. § 1188(c)(3) (West 2005).[7] When an application is rejected on its merits or because it is incomplete, the employer may request an expedited review of the denial. 8 U.S.C.A. § 1188(e) (West 2005).  At the employer's request, an administrative law judge convenes a *de novo* hearing within five working days after the judge receives the case file, and the decision is due within 10 days after the hearing.  20 C.F.R. § 655.112(b)(1) (ii) & (iii) (2006).  It becomes the "final decision of the Secretary, and no further review shall be given to the temporary alien agricultural labor certification application or the temporary alien agricultural labor certification determination by any DOL official."  20 C.F.R. § 655.112(b)(2).  These accelerated time frames to advise an employer of any omissions, to permit a modification, to determine whether to grant the application, to offer review in an administrative hearing and to issue a final decision, implement the Congressional policy that the Secretary dispose of H-2A matters with dispatch.

> B.     *The Hearing Request*

The Respondents' business is to obtain foreign agricultural workers for American farms that need them.  They may apply for H-2A temporary alien agricultural labor certifications in their own name (for Global Horizons Manpower, Inc.) or as agents for employers they represent. 8 C.F.R. § 214.2(h)(5)(i)(A) & 20 C.F.R. §655.201(a)(2).  Well-versed in H-2A program requirements and regulations, they have requested review of the Department's determinations before administrative law judges in at least 18 cases since 2003.[8]  Global's employees include an immigration attorney.  *See,* the response to the Department's motion to dismiss at pg. 2, and the declaration of Arik Ben-Ezra.

The Respondents have experience with debarment notices too.  The Department brought an earlier proceeding to debar these Respondents, that sought additional relief as well.  *In re: Global Horizons Manpower, Inc. and Mordechai Orien,* Cases No. 2005-TLC-00006 and 2005-TAE-00001.  The Department alleged they had committed several substantial violations of the

---

[7]  The Secretary's regulations have not yet been updated, and continue to reflect an older 20-day requirement.  20 C.F.R. §§ 655.101(b)(1); 655.101(c)(2) (2006).  Section 748 of Public Law 106-78, dated October 22, 1999, amended section 218(c)(3)(A) of the Immigration Act [8 U.S.C.§ 1188(c)(3)] by changing "20 days" to "30 days."

[8]  *Global Horizons, Inc.,* 2006-TLC-14 (ALJ Sept. 19, 2006); *Global Horizons, Inc.,* 2006-TLC-10 (ALJ Sept. 19, 2006); *Global Horizons, Inc. (Creekside Mushrooms, Ltd.),* 2006-TLC-6 (ALJ May 17, 2006); *Global Horizons, Inc.,* 2006-TLC-4 (ALJ Mar. 2, 2006); *Global Horizons, Inc.,* 2005-TLC-18 (ALJ Oct. 7, 2005); *Global Horizons, Inc.,* 2005-TLC-14 (ALJ June 21, 2005); *Global Horizons. Inc.,* 2005-TLC-12 (ALJ May 25, 2005; *Global Horizons, Inc. (Valley Fruit Orchard and Green Acre Farm),* 2005-TLC-11 (ALJ June 8, 2005); *Global Horizons, Inc.,* 2005-TLC-10 (ALJ May 25, 2005); *Global Horizons, Inc. (Valley Fruit Orchards),* 2005-TLC-9 (ALJ June 1, 2005); *Global Horizons, Inc.,* 2005-TLC-7 (ALJ Apr. 28, 2005); *Global Horizons Inc. (Zirkle Fruit Co.),* 2005-TLC-1 (ALJ Oct. 18, 2004); *Global Horizons (Green Acre Farm),* 2005-TLC-4 (ALJ Feb. 25, 2005); *Global Horizons (Zirkle Farms),* 2005-TLC-3 (ALJ Feb. 25, 2005) ; *Global Horizons Inc. (Kauai Coffee Co.),* 2004-TLC-13 (ALJ Sept. 27, 2004); *Global Horizons Inc.,* 2004-TLC-11 (ALJ July 30, 2004); *Global Horizons Manpower, Inc.,* 2003-TLC-9 (ALJ Aug. 4, 2003); *Global Horizons Manpower, Inc.,* 2003-TLC-5 (ALJ Apr. 11, 2003).  *See* www.oalj.dol.gov/PUBLIC/INA/REFERENCES/CASELISTS/TLC_DECISIONS.HTM.

regulations that govern the terms and conditions of the H-2A workers' employment, the workers' benefits, and the workers' pay with respect to aliens who labored on farms in Hawaii. *See* the Department's February 23, 2005 Determination and Notice of Prospective Denial of Temporary Alien Agricultural Labor Certification for Three Years (Debarment Notice). The Department's Debarment Notice in that consolidated case was sent by certified mail, but addressed to the Respondents at 10474 Santa Monica Boulevard, Suite 403, Los Angeles, California 90025. Their former lawyers, McGuiness, Norris & Williams LLP of Washington, D.C., served the Respondents' request for hearing on March 2, 2005. The Respondents alleged in their hearing request that the Debarment Notice had been misaddressed, and that the Respondents' correct address was nearby at 11111 Santa Monica Boulevard, Suite 1440, Los Angeles, California 90025. The Hawaii debarment matter remains pending at the Office of Administrative Law Judges, after the Respondents withdrew from a settlement that had been approved.[9]

Based on that rather recent experience, there was no reason to believe that mailing another notice by certified mail – correctly addressed this time – would impair the Respondent's ability to request a hearing in a timely fashion. The Determination Notice from the Administrator of the Office of Foreign Labor Certification found, based on his investigation, that in a certification application for jobs in California for the period from August 1, 2003 to April 30, 2004, the Respondents (1) willfully and fraudulently misrepresented that Global Horizons Manpower Inc. had contracts with Taft Vegetable Farm for 200 workers when there was no contract and there were no jobs, and (2) knowingly gave false information, *viz.*, that H-2A workers brought into the country had been terminated for cause (poor performance), when they had been terminated because the Respondents had no work for them. Administrative Record (AR) at 14. The implication was that the Respondents brought those workers into the country without work, shopped them to farmers after they arrived, and when unsuccessful, fired them. AR at 3-4; 8; 13-14; 144. These willfully false statements, which are "substantial violations,"[10] led the Administrator to impose the maximum penalty, barring the Respondents from submitting any other H-2A certification applications for three years.

The Administrator's July 27, 2006 Determination Notice explained how to contest the debarment. Tracking 20 C.F.R. § 655.110(a), it advised the Respondents that they:

> ha[d] the right to request an expedited administrative review or a
> *de novo* hearing of this Determination before a United States
> Department of Labor Administrative Law Judge. If either of the
> [Respondents] makes such a request, the request must be in writing
> and dated, must specify whether an administrative review or *de*
> *novo* hearing is requested, and must be served on the Department
> of Labor, Employment and Training Administration, Office of
> Foreign Labor Certification, Attention: Bill Carlson, 200
> Constitution Avenue, N.W., Room C-4312, Washington, D.C.

---

[9] The facts in this paragraph are based on the Notice of Intent to Take Official Notice issued on Oct. 4, 2006. No party objected to it.

[10] See the definition of the term at 20 C.F.R. § 655.110(g)(1)(i)(E) (2006).

20210, within seven calendar days of the date of this
Determination Notice.

The Respondents received the certified mail on August 3, 2006, 7 calendar days after it was mailed. AR at 5. Their request for a *de novo* hearing was sent by overnight delivery to the Administrator on Friday, August 11, 2006, eight days after the Determination Notice was delivered to them. They made no request to extend their time to respond, nor did they acknowledge that their request for hearing was late. The Administrator received their hearing request the next business day, on Monday August 14, 2006. AR 1; 2.

Through the declaration of Arik Ben-Ezra, the Respondents state that Global's Human Resources department provided the Determination Notice to its legal department "approximately a week after it was delivered," at which point the legal department "acted quickly" to send the hearing request by overnight delivery on Friday, August 11, 2006. The employee who had signed the receipt for the certified mail, Rob Rutt, says he delivered it on August 3, 2006 (a Thursday) to an administrator who gave it to an employee who scans mail into the computer system. Alejandra Rosales, who did the scanning, declares that she scanned it "in the late afternoon,"[11] and forwarded it on to the Human Resources Department.

The hearing request was late, not because the Respondents failed to mail it on August 3, 2006, but because it languished for eight calendar days before anyone did anything about it. Scanning obviates the need to shuffle paper around because correspondence becomes digitally available throughout the office network. The central question is why nobody dealt with the Determination Notice for over a week, not so much why the paper itself sat somewhere at the Human Resources department. The declarations offer no explanation.

C.   *The Standard Used to Determine Whether to Accept Belated Requests for Hearing
or Review at the Department of Labor*

1.   <u>Lateness as a Jurisdictional Defect</u>

The short time available for what the statute's catchline calls "administrative appeals" is rooted in the statutory text requiring that the Secretary's "[r]egulations shall provide for an expedited procedure for . . . review." 8 U.S.C.A. § 1188(e)(1) (West 2005). Through rulemaking the Secretary set the period as "seven calendar days" from "the date of the notice." 20 C.F.R. § 655.110(a)(2006).

The only decision within the Department of Labor to consider the effect of a late request for an expedited review under the H-2A regulations involved the rejection of a facially unacceptable application, which is governed by a different regulation that also allows seven days to seek review. *See* 20 C.F.R. § 655.104(c) (2006).[12] That employer's hopelessly late request

---

[11] Exhibit B to her declaration fixes the time as 3:44 p.m.

[12] The pertinent regulation's text, which governs expedited review of a determination not to accept an H-2A application for consideration, requires that the notice the Department sends to the employer "state that in order to obtain such a review or hearing, the employer, *within seven calendar days of the date of the notice*, shall file by facsimile (fax), telegram, or other means normally assuring next day delivery a written request to the Chief Administrative Law Judge of the Department of Labor . . . ." (emphasis added) 20 C.F.R. § 655.104(c)(3) (2006).

- 7 -

for review was submitted on November 3, 1998, when the determination served on August 21, 1998 informed him of the option to submit a modified application within five days, or to request a judge's review within seven. The administrative law judge held the overdue hearing request left him without jurisdiction, and dismissed it. *Mike Langley Farms, Inc.*, 1999-TAE-001 (ALJ Nov. 13, 1998).

Most administrative bodies and courts treat regulations that set the time to file a request for a hearing or for review not as grants of jurisdiction, but as limitations periods that are subject to equitable tolling. The jurisdictional ruling was never subject to review within the Department of Labor because a presiding administrative law judge's decision becomes the Secretary's final order. 20 C.F.R. § 655.112(2)(b).[13] The Administrator has not argued that this hearing request must be dismissed for want of jurisdiction, and I regard the jurisdictional holding in *Mike Langley Farms, Inc.* as an error.

Whether the failure to file a timely request for a judge's review is considered a jurisdictional defect, or one that could be excused on a proper showing, the Respondents have failed to show that their late request for hearing should be accepted.

      2.    Standards Applied in H-1B Matters

The Secretary of Labor adjudicates other matters arising under the Immigration Act's visa programs that provide useful authority by analogy. Among these are complaints that an employer violated a labor condition application the employer filed to obtain an H-1B visa to admit a nonimmigrant alien to work temporarily in a specialty occupation.[14] 8 U.S.C.A. §§1101(a)(15)(H)(i)(b); 1182(n)(2) (West 2005); 20 C.F.R. § 655.810 (2006). Administrative law judges have dismissed late requests for hearing under that program. *Alhames v. South Coast Auto Insurance Marketing Inc.*, 2006-LCA-8 (ALJ April 12, 2006) (dismissing an H-1B worker's untimely hearing request that sought to challenge the Department's calculation of the amount he had been underpaid); *U.S. Dep't of Labor v. Vibex, Inc.*, 2003-LCA-9 (ALJ March 25, 2003) (dismissing an H-1B employer's untimely hearing request that sought to review the Department's determination that it underpaid its H-1B workers almost $81,000). Those decisions did not discuss the circumstances in which a late request might be accepted, however.

---

[13] The contrary statement in the Order for Further Briefing entered on Oct. 4, 2006 at pg. 1 was an error. The Administrative Review Board has no jurisdiction to review this decision.

[14] A "specialty occupation" is one that requires entry level employees to have mastered a body of highly specialized theoretical and practical knowledge by earning a baccalaureate or a more advanced degree. 8 U.S.C.A. § 1184(i)(1) (West 2005); 8 C.F.R. § 214.2(h)(4)(iii)(A) (2006); 20 C.F.R. § 655.715 (2006). Architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts are examples. 8 C.F.R. § 214.2(h)(4)(ii) (2006). The U.S. Citizenship and Immigration Services component of the Department of Homeland Security identifies and defines the occupations covered by the H-1B category and determines whether the alien qualifies to work in those occupations. 8 C.F.R. § 214.2(h)(4)(iv) (2006). The Secretary of Labor approves and enforces the labor condition applications the employers must make to obtain H-1B visas for those workers. 20 C.F.R. § 655.705; §§ 655.800-855 (2006); 59 Fed. Reg. 65,646 (Dec. 20, 1994).

The Administrative Review Board (Board) reviews administrative law judge decisions and issues final orders in H-1B matters on behalf of the Secretary of Labor.[15]  The Board takes an exacting approach when requests for its review are filed late.  It dismissed, for example, an appeal from an administrative law judge's decision that an H-1B employer owed six workers about $80,000 when the review petition arrived two days late.  *Administrator v. Wings Digital Corp.*, ARB No. 05-090, ALJ No. 2004-LCA-30 (ARB July 22, 2005).

As it decides whether to accept untimely petitions, the Board applies the demanding standards for equitable tolling the federal courts have developed in decisions such as *School Dist. of the City of Allentown v. Marshall*, 657 F.2d 16, 18 (3rd Cir. 1981).  The opinion in *Marshall* emphasizes how sparingly Article III courts dispense equitable relief.  The Third Circuit held the requirement that an employee complain to the Secretary of Labor within 30 days of alleged employment discrimination, found in the whistleblower protection provision of the Toxic Substances Control Act,[16] is not jurisdictional and might be extended by equitable tolling.  It then reversed the Secretary's decision that permitted a teacher to complain about how his public employer treated him, because he failed to present the matter to the Secretary within that statutory 30-day window.  The teacher wanted to investigate personally whether asbestos was present in school buildings on the district's campuses, but was allowed free access only to the campus where he taught.  A state environmental resources agency had already investigated for asbestos on other campuses.  The three acts of discrimination the teacher alleged (refusal to let him roam district buildings freely; questioning him about one of his lesson plans, allegedly as an act of retaliatory harassment; and not allowing him to take a second day of paid leave for personal convenience without giving a reason for his absence) all took place no later than April 5, but he waited to complain to the Department of Labor until May 29.  As the court rejected the Secretary's decision to accept and to adjudicate the tardy complaint, it reminded the Secretary that the requirements for equitable tolling are to be "scrupulously observed."  *Id.* at 19.  To succeed, the teacher had to fit within the principal situations the case law recognized were justifications for tolling, which were that:

> (1) the district actively misled him about its rights to seek relief under the Toxic Substances Control Act, or
>
> (2) he had been prevented in some extraordinary way from asserting his rights, or
>
> (3) he mistakenly had presented the precise statutory claim in a timely manner in the wrong forum.

---

[15] The Board's jurisdiction is set in Secretary's Order No. 1-2002, published at 67 Fed. Reg. 64,272 (Oct. 17, 2002).

[16] 15 U.S.C.A. § 2622(b) (West 1998).  Short complaint periods are found in several environmental whistleblower protection statutes, including the Safe Drinking Water Act, 42 U.S.C.A. § 300j-9(i) (West 2003); the Water Pollution Control Act, 33 U.S.C.A. § 1367 (West 2001); the Toxic Substances Control Act, 15 U.S.C.A. § 2622 (West 1998); the Solid Waste Disposal Act, 42 U.S.C.A. § 6971 (West 2003); the Clean Air Act, 42 U.S.C.A. § 7622 (West 2003); and the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.A. § 9610 (West 1995), all of which are implemented at 29 C.F.R. § 24.1(a) and § 24.3(b) (2006).

None applied.  Under the *Marshall* court's approach, whether the school district was prejudiced in defending the whistleblower claims was not an independent factor; it would enter the calculus only if a traditional factor supporting equitable relief were present.[17]  The court rejected the Secretary's order that had extended the complaint period because the school district did not prove that doing so would have prejudiced its defense somehow (*e.g.*, by showing that material evidence became unavailable because witnesses could no longer be located, or their memories had faded).  *Id.* at 20.  With a statutory 30-day limitation period, showings of that kind would be virtually impossible, so the whistleblower complaint period would be subject to routine extensions.  Congress had balanced the employees' right to file retaliation complaints against the limited time their employers "would be exposed to liability." *Id.* at 21.  It was not the Secretary's role to strike another balance.  The court "set aside" the Secretary's decision as an action taken "in excess of statutory limitations," applying the judicial review standards of the federal administrative procedure act, 5 U.S.C.A. § 706(2)(C) (West 2005).

Here, in a variation on *Marshall's* theme, Congress insisted on expedited review in 8 U.S.C.A. § 1188(e) (West 2005), and the Secretary set the number of days for the procedural steps in H-2A matters through notice and comment rulemaking.  I believe that the standards for equitable tolling also ought to be used in deciding whether to accept this late hearing request.

The Administrative Review Board has come to regard the three *Marshall* factors as nonexclusive, so equitable tolling is best conceived as having a fourth, catch-all factor that permits the adjudicator to consider any truly exceptional circumstances those three do not encompass.  *Wings Digital Corp., supra*, ARB slip op. at 4.  This fourth factor is not applied expansively, however.

The claim by the lawyer for *Wings Digital* that he couldn't file on time because he suffered from a "pounding headache and fever" in the last days of the filing period left the Board unmoved.  The review petition itself was dated two days before the due date, so the Board reasoned that a lawyer well enough to draft it ought to have been able to fax it to Washington, or to contact the Board to request an enlargement of the filing time.  He did neither.  The lawyer's other argument, that he thought he had 30 days from receipt of the administrative law judge's decision to petition for review, was refuted by the decision's "unambiguous statement of the steps [any party] must take to perfect its appeal," which informed the parties that a "petition for review must be received by the  [Board] within 30 calendar days of the date of the Decision and Order." *Id.* at 3, 5.  The Board held that ignorance of legal rights is no basis to toll a statute of limitations.  Neither the claim of illness nor the claim to have misunderstood the time available to seek review presented an "extraordinary circumstance that excuse[d] Wings Digital's failure to timely file its petition." *Id.* at 5.

---

[17] The U.S. Supreme Court used similar language three years later when it held: "[a]lthough absence of prejudice is a factor to be considered in determining whether the doctrine of equitable tolling should apply once a factor that might justify such tolling is identified, it is not an independent basis for invoking the doctrine and sanctioning deviations from established procedures." *Baldwin Co. Welcome Centr. v Brown*, 466 U.S. 147, 152 (1984).

3.      Standards Applied in Whistleblower Protection Matters

   a)      Statutes related to transportation safety

   The Board has affirmed an administrative law judge's dismissal of whistleblower protection claims a professional truck driver made under the Surface Transportation Assistance Act[18] when he waited almost 10 months to request a hearing. Each time OSHA informed him that its investigations found no merit to any of the three claims he filed, he was told he had 30 days to request a hearing. *Tavares v. Swift Transportation* Co., ARB No. 01-036, ALJ No. 2001-STA-13 (ARB Oct. 2, 2001). That Act states that "the complainant and the person alleged to have committed the violation may file objections to the findings or preliminary order [of OSHA], . . . and request a hearing on the record . . . . If a hearing is not requested within 30 days, the preliminary order is final and not subject to judicial review." 49 U.S.C.A. §31105(b)(2)(B) (West 2005).[19]   The administrative law judge found that the truck driver offered no reasons that justified equitable tolling of his time to request a hearing, so all claims were dismissed. *Id.* at 2.

   The Board applies strictly the regulations that set short periods of 10 to 15 days[20] to petition for review when a whistleblower protection complaint involves an air carrier. In a matter filed under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century,[21] a petition for review sent by overnight delivery that arrived in Washington, D.C. one day late was dismissed, in part because the worker could have faxed it to the Board on the due date. *Herchak v. America West Airlines, Inc.,* ARB No. 03-057, ALJ No. 02-AIR-00012, slip op. at 6 (ARB May 23, 2003), *rev. denied,* 125 Fed. Appx. 102 (9th Cir. 2004) (unpublished).[22]   The Board's "internal procedural rule" setting the short filing time was adopted "to expedite the administrative resolution of cases,"[23] something equally true of the expedited final orders administrative law judges issue for the Secretary in H-2A matters. The worker in *Herchak* failed to carry his burden, for the opposing party had not misled him, he had not filed mistakenly in the wrong forum, and no *extraordinary* event precluded a timely filing. *Id.* at 6 (emphasis by the Board).   A party's own negligence is not an extraordinary circumstance that qualifies for

---

[18] 49 U.S.C.A. §31005 (West 1997).

[19] The Secretary's regulation essentially repeats the Act, saying that: "[i]f no timely objection is filed with respect to either the findings or the preliminary order [made by OSHA after investigating a complaint], such findings or preliminary order, as the case may be, shall become final and not subject to judicial review." 29 C.F.R. §1978.105(b)(2) (2006).

[20] Under an interim regulation the time to file a petition for review in air carrier whistleblower matters had been 15 days from the date of the administrative law judge's decision. 67 Fed. Reg. 15454 (Apr. 2, 2002). The Secretary's final regulation now requires that a petition for review be filed within 10 business days. 29 C.F.R. § 1979.110(a), 68 Fed. Reg. 14100, 14106 (Mar. 21, 2003) (finding that ten days "is sufficient time to petition for review of an ALJ decision").

[21] 49 U.S.C.A § 42121 (West Supp. 2005).

[22] The Ninth Circuit's unpublished decision affirming the Secretary is not precedent. *See,* Ninth Cir. Rule 36-3 (b) ("Unpublished dispositions and orders of this Court may not be cited to or used by the courts of this circuit.") and *Hart v. Massanari,* 266 F.3d 1155, 1159 (9th Cir. 2001) (applying the no-citation rule).

[23] *Herchak, supra,* ARB slip op. at 4-5.

equitable tolling.  *Miranda v. Castro*, 292 F.3d 1063, 1067 & n. 4 (9th Cir. 2002) (applying the standards for equitable tolling to reject a habeas corpus matter under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C.A. § 2244(d)(1)(A)).

> b)      Statutes related to financial markets

The equitable tolling standard has been applied to dismiss an appeal under whistleblower protection provisions of the Sarbanes-Oxley Act.[24]  *Minkina v. Affiliated Physician's Group*, ARB No. 05-074, ALJ No. 2005-SOX-19, slip op. at 5 (ARB July 29, 2005) (finding the inability to retain counsel is not an extraordinary event that justified filing a review petition nearly two weeks late; the administrative law judge's decision gave the unrepresented party correct instruction about when a petition for review was due).

> c)      Statutes related to nuclear and environmental protection

These rigorous equitable tolling standards have been applied under the nuclear and environmental whistleblower protection statutes,[25] where a separate regulation[26] also requires that parties file their petition for review with the Board within 10 days of the date of administrative law judge's decision.  *See e.g. Dumaw v. Int'l Brotherhood of Teamsters, Local 690*, ARB No. 02-099, ALJ No. 2001-ERA-6 (ARB Aug. 27, 2002), *aff'd sub nom. Dumaw v. U.S. Dept. of Labor*, No. 02-73020 (9th Cir. 2003) (unpublished) (rejecting a late petition in a proceeding brought under the Energy Reorganization Act); *Hemingway v. Northeast Utilities*, ARB No. 00-074, ALJ Nos. 99-ERA-14 & 15, slip op. at 4-5 (ARB Aug. 31, 2000) (similarly rejecting a petition for review filed in a Energy Reorganization Act matter 15 weeks out of time); and *Duncan v. Sacramento Metro. Air Quality Mgmt. Dist.*, ARB No. 99-01, ALJ No. 97-CAA-121 (ARB Sept. 1, 1999) (accepting a late petition for review in a proceeding under the Clean Air Act that the *pro se* party had filed on time, at the Office of the Chief Administrative Law Judge rather than at the Board); *Gutierrez v. Regents of the University of California*, ARB Case No. 99-116, ALJ Case No. 98-ERA-19; Order Accepting Petition for Review and Establishing Briefing Schedule (ARB Nov. 8, 1999) (accepting a review petition in a proceeding under the Energy Reorganization Act filed by a party represented by counsel on time, but also at the Office of the Chief Administrative Law Judge).  Petitions for review of whistleblower protection decisions under the Pipeline Safety Improvement Act[27] must be filed within 10 days as well. 29 C.F.R. § 1981.110(a) (2006).

---

[24] 18 U.S.C.A. § 1514A (West Supp. 2005).

[25] These include whistleblower retaliation claims made under the statutes listed in footnote 16, *supra*, and the Energy Reorganization Act, 42 U.S.C.A.§ 5851 (West Supp. 2005).

[26] 29 C.F.R. § 24.8(a) (2006), which reads: "[a]ny party desiring to seek review, including judicial review, of a recommended decision of the administrative law judge shall file a petition for review with the Administrative Review Board ("the Board"), which has been delegated the authority to act for the Secretary and issue final decisions under this part. To be effective, such a petition must be received *within ten business days* of the date of the recommended decision of the administrative law judge, and shall be served on all parties and on the Chief Administrative Law Judge. (emphasis supplied).

[27] 49 U.S.C.A. § 60129 (West Supp. 2005).

4.    Standards Applied in Davis-Bacon Act Matters

Equitable tolling has been applied under the Davis-Bacon Act[28] to permit a late review petition when the administrative law judge's decision misinformed the parties about the time available to file it. *In re Tri-Gem Builders*, ARB No. 99-117, ALJ No. 1998-DBA-17, slip op. at 4-5 (ARB Nov. 22, 1999). The substantive portion of the trial decision had required a contractor to pay back wages to employees and debarred it from future government contracting. The Board's procedural ruling was a variation on the typical requirement for equitable tolling, that the opponent affirmatively mislead the party about his or her rights. The decision to accept the appeal exemplifies the catch-all fourth factor that the Board articulated more clearly in its later decision in *Administrator v. Wings Digital Corp.*, ARB No. 05-090, ALJ No. 2004-LCA-30 (ARB July 22, 2005), discussed above.[29] Ultimately the parties in *Tri-Gem Builders* settled, so the Board issued no decision on the merits. The Administrator's Determination Notice delivered to these Respondents was not misleading, however, so the basis for tolling *Tri-Gem Builders* articulated would not apply to them.

The Board did accept a review petition in a Davis-Bacon Act matter that was filed three days late because the lawyer miscalculated the due date when he added the five days for mailing that the procedural rules of the Office of Administrative Law Judges authorize. *Superior Paving & Materials*, ARB No. 99-065, ALJ No. 1998-DBA-11 (ARB Sept. 3, 1999). Those rules for the trial level do not apply before the Board. The Board seemed to have been impressed that the review petition would have been filed two days early if the way the lawyer computed time had been correct. It decided that the litigant had not "slept on his rights," and that the Department has not been prejudiced. The Board never mentioned that the administrative law judge's decision had correctly stated the procedure to obtain review, something it emphasized in its more recent *Minkina, Wings Digital Corp., Herchak, Hemingway,* and *Tavares* decisions discussed above. Evidence that a party was informed correctly about how to protect his or her rights affects whether the failure to take those steps will be forgiven, even when the party acts only a few days late. *See Baldwin County Welcome Cntr. v Brown*, 466 U.S. 147 (1984) (denying equitable tolling for a Title VII claim and explaining that "[o]ne who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence," *id.* at 151).

D.    *Standards Applied Under Federal Procurement-Related Debarment Programs*

The Administrator imposed a prospective refusal to accept temporary alien agricultural labor certifications from the Respondents for three years, something analogous to procurement-related debarments. The federal government has well-established processes to make businesses and individuals ineligible for procurement contracts or nonprocurement programs.[30] Debarment reduces the harm the government suffers by continuing to do business with entities or individuals

---

[28] 40 U.S.C.A. §276a *et seq.* (West 2001).

[29] It might also be viewed as a situation where the judge "led the [claimant] to believe that [he] had done everything required," which justifies tolling. *Baldwin Co. Welcome Cntr. v. Brown*, 466 U.S. 147, 151 (1984).

[30] Nonprocurement programs include federal financial and non-financial assistance and benefits such as grants, cooperative agreements, scholarships, fellowships, contracts of assistance, loans, loan guarantees, subsidies, insurance, payments for specified use, and donation agreements.

who have shown themselves to be unethical or incompetent. *See generally, Caiola v. Carroll*, 851 F.2d 395, 399 (D.C. Cir. 1988). Those suspended or debarred are added to the List of Parties Excluded from Federal Procurement and Nonprocurement Programs (EPLS) that the General Services Administration publishes at http://epls/arnet.gov. The substantive standards for suspension and debarment under procurement and nonprocurement programs differ from those the Administrator relied on in this Determination and Notice. I asked the parties to research how federal agencies have treated untimely responses to suspension, debarment or exclusion notices. Those decisions have not proven to be particularly helpful, unfortunately.

      1.    <u>EPA</u>

      The EPA requires an entity that receives a debarment notice to file a petition challenging the basis for that adverse action within 30 days. 40 C.F.R. § 32.820(a) (2006); 40 C.F.R. § 32.313 (1996).[31] It nevertheless allowed a contractor to participate in a debarment proceeding, when its lawyer filed a late response to the debarment notice. *In the Matter of: Danny's Custodial Care, Inc.*, EPA Case No. 93-0261-00, 1997 EPADEBAR 11, at *3-*4 (June 24, 1997). A second notice of proposed debarment was served on the contractor when it appeared that the EPA's original notice likely had omitted an important document that explained the factual basis for the debarment – the agency's Action Request Memorandum. The timely hearing request the contractor filed in response to the second notice mooted the timeliness issue. Ultimately a three-year government-wide debarment was imposed based on the guilty plea the contractor had entered to the crime of improper disposal of hazardous waste. The notice the Administrator sent the Respondents here was not deficient, so the EPA decision adds nothing to the analysis.

      The decision in *In the Matter of: Commonwealth Laboratories , Inc,*. EPA Case No. 94-0059-01, 1995 EPADEBAR LEXIS 10 (Aug. 24, 1995) involves no late request for a hearing, so it is not relevant. The appellate authority within the EPA entertained the agency's untimely request to reconsider the length of the debarment imposed at the trial level.

---

[31] Entitled **Opportunity to contest proposed debarment,** it read:

      (a) Submission in opposition. Within 30 days after receipt of the notice of proposed debarment, the respondent may submit, in person, in writing, or through a representative, information and argument in opposition to the proposed debarment.

      (1) If the respondent desires a hearing, it shall submit a written request to the debarring official within the 30-day period following receipt of the notice of proposed debarment.

      (2) [Reserved]

      (b) Additional proceedings as to disputed material facts. (1) In actions not based upon a conviction or civil judgment, if the debarring official finds that the respondent's submission in opposition raises a genuine dispute over facts material to the proposed debarment, respondent(s) shall be afforded an opportunity to appear with a representative, submit documentary evidence, present witnesses, and confront any witness the agency presents.

2.    Department of Agriculture

The Department of Agriculture permitted a respondent additional time to respond to a debarment notice after the 30-day period to do so had expired. *In re: Luis C. Trigo-Vela,* 56 Agric. Dec. 731, 1997 USDA LEXIS 82 (Apr. 17, 1997). Two notices of the proposed debarment sent by certified mail had been returned unclaimed. The reviewing administrative law judge found that the agency should also have sent another notice by regular mail, because the agency knew the respondent "was receiving mail at its last known address." *Id.* at *4. The respondent also had requested an opportunity to respond promptly after it accidentally learned of the debarment proceeding in the course of a bankruptcy proceeding, before the debarment became final. Here the Administrative Record shows, and the Respondents do not deny, that they received the Determination Notice by certified mail. They then failed to exercise due diligence in responding to it.

E.    *The Standards to Vacate A Default under the Federal Rules of Civil Procedure*

Courts may vacate clerk's defaults, and judgments entered on defaults, under the generous standards set in Rules 55(c) and 60(b) (1)–(6). Fed. R. Civ. P. They encompass "good cause," "mistake inadvertence, surprise, or excusable neglect," or "any other reason justifying relief from the operation of the judgment [entered on the default]."

The failure to respond to a Determination Notice bears a superficial resemblance to a failure to respond to a summons and complaint, but is more analogous to a failure to file a complaint within the statute of limitations. Equitable tolling governs the period in which to file a cause of action, to request a hearing or to apply for review, while standards such as "good cause" characteristically apply to deadlines that arise within the course of proceedings that were initiated within the prescribed time. In the alternative, agencies are free to adopt procedural rules and to enforce them strictly, so long as the rules are applied uniformly or exceptions are made only for good reasons the agency articulates. *Green Country Mobilephone v. FCC,* 765 F.2d 235, 237 (D.C.Cir. 1985). Agencies are not required to import their standards from Rules 55 or 60, Fed. R. Civ. P.

It is a mistake to regard equitable tolling as just one more manifestation of the general authority courts and administrative agencies enjoy "to relax or modify [their] procedural rules adopted for the orderly transaction of business before [them] when, in a given case, the ends of justice require it." *American Farm Lines v. Black Ball Freight Services,* 397 U.S. 532 (1970). No filing deadline to initiate a proceeding was involved in that case, where an applicant was seeking authority to operate a temporary shipping route. The unserved shipper was the Department of Defense, which urgently required the services. The Supreme Court approved the ICC's decision to relieve the applicant from a requirement in the Commission's rules that applications state the dates motor carriers with existing routes declined shipping requests. The application from the potential new shipper contained enough detailed information that existing carriers had been able to file lengthy, precise and informed objections with the Commission. The hearing request at issue here is a very different, and uniquely time-sensitive, type of filing.

F.    *Agencies May Apply Procedural Deadlines Strictly*

The courts of appeals routinely affirm strict application of filing deadlines agency regulations impose, so long as they are applied consistently. The Respondents do not argue that the Secretary of Labor enforces hearing request deadlines haphazardly.

The D.C. Circuit recently upheld the U.S. Copyright Office's strict interpretation of its regulations that require copyright owners to file claims each July, to obtain a proportionate share of royalties cable and satellite broadcasters pay into a fund that Office administers. *Universal City Studios, LLP v. Peters,* 402 F.3d 1238 (D.C. Cir. 2005). Under the regulations, timely claims are ones that (1) the Office receives during July; (2) the Office receives through the Postal Service on August 1; or (3) the Office receives through the Postal Service on or after August 2, if they bear a July United States Postal Service mark (a) on the envelope or (b) on a certified mail receipt. For claims the Office receives after July 31, the regulation says that dates printed on envelopes by business postage meters do not qualify. 37 C.F.R. § 252.4(c) (2001). Copyright owners who could not produce a stamped postal receipt showing that their claims, which the Copyright Office received after August 1, had been mailed in July were denied any share in that year's royalties. The court of appeals upheld the agency's refusal to accept sworn statements from the employees responsible for mailing the royalty claims as proof they had mailed them on July 30, 2001, or declarations from Postal Service employees to prove that the normal delivery time for a letter sent from southern California to Washington, D.C. is three[32] to five days, as evidence that their late-received claims had been posted in July. The court also upheld the agency's decision that there was no "special or unique circumstance . . . that would warrant a waiver " of the regulation's requirements, which the copyright owners had requested. *Id.* at 1240. The D.C. Circuit held that an "agency's strict construction of a general rule in the face of waiver requests is insufficient evidence of an abuse of discretion" (*id.* at 1242), relying on the judicial review standards found in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and *Omnipoint Corp. v. FCC,* 213 F.3d 720, 723 (D.C. Cir. 2000).

The Tenth Circuit upheld the Federal Labor Relations Authority's right to reject objections to an administrative law judge's decision that were not sent to the address the Authority's regulations designated, a requirement that the trial judge's decision repeated. The rejection of the exceptions had the additional effect of depriving the court of appeals of jurisdiction to consider the substantive error the exceptions sought to raise. "[T]he general rule is well established that reviewing courts will not overturn an agency's strict application of its own procedural regulations so long as the rule is applied uniformly or with reasoned distinctions." *Tinker Air Force Base v. FLRA,* 321 F.3d 1242, 1247 (10th Cir. 2002).

The Ninth Circuit found that the National Transportation Safety Board (NTSB) did not act arbitrarily and capriciously when it strictly applied its filing deadlines. *Gilbert v. NTSB,* 80 F.3d 364 (9th Cir. 1996). The NTSB had dismissed an appeal from an administrative law judge's decision upholding the FAA's 90-day suspension of a commercial pilot's license for careless or reckless flying. The pilot's brief to the NTSB was served out of time, due to

---

[32] The Office likewise rejected evidence from an experiment in which 100 letters were posted from southern California to Washington. None arrived in fewer than three days, suggesting that a claim the Office received on August 3 must have been mailed by July 31.

problems his lawyer encountered in printing it.  The lawyer neglected to serve a request for an extension of time before the time to serve the pilot's brief expired (which he could have written in longhand and mailed the day the brief was due), or when he filed the late brief at the NTSB. Like these Respondents, the lawyer merely filed the document late.  When the FAA challenged the late filing, the pilot argued that his delay had not prejudiced the FAA.  The Ninth Circuit found no due process violation in the NTSB's dismissal; the court denied the pilot's petition to review the NTSB's finding that the pilot had failed to show good cause[33] for his failure to serve an extension motion within the time available to file the brief. *Id.* at 368.

G.    *Equitable Tolling in the Ninth Circuit*

According to the Ninth Circuit, the doctrine of equitable tolling excuses a claimant's failure to comply with time limitations when he or she "had neither actual nor constructive notice of the filing period." *Leorna v. U.S. Dep't of State*, 105 F.3d 548, 551 (9th Cir. 1997).  Relief also requires that the claimant act with "all due diligence" to preserve his or her cause of action. *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1175 (9th Cir. 2000) (rejecting a claim for equitable tolling in a claim for invidious disability discrimination).

The court affirmed a summary judgment against a U.S. Postal Service employee who filed suit claiming that she was terminated in retaliation for complaining to her supervisors about sexual harassment by co-workers. *Johnson v. Henderson*, 314 F.3d 409 (9th Cir. 2002).  Her Title VII action was dismissed because she had failed to exhaust administrative remedies within the agency, and failed to show her late filings within  the agency qualified for equitable tolling. A federal employee who believes she has been subjected to sexual harassment must contact an EEO counselor with a request for counseling within 45 days of the discriminatory event.  29 C.F.R. § 1614.105(a) (2006).  Thereafter she must file a formal complaint with the agency after she receives a "right to file letter" from the agency.  29 C.F.R. § 1614.106 (2006); *see also Brown v. Gen. Services Admin.*, 425 U.S. 820 (1976).  In her June 24, 2000 written request for EEO counseling, Ms. Johnson gave August 8, 1999 as the harassment date (far more than 45 days before her request), although elsewhere she said it happened on October 12, 1999 (also more than 45 days before her request).  The Postal Service responded to her counseling request with a certified letter mailed to her home, for which it obtained a signed receipt showing delivery on August 4, 2000.  The letter told her she had 15 days in which to file a formal EEO complaint with the agency.  By that time she also had retained a lawyer.  Her EEO complaint was not filed with the Postal Service until September 8, 2000, once again out of time.

Ms. Johnson professed she knew nothing of the 45-day requirement to seek counseling, a claim the magistrate judge rejected because employees were put on notice of the required procedures by posters displayed at the work site, and by a "Learner's Workbook" given to new Postal Service employees that contained a chart setting out the time required to perfect each step in an EEO complaint. *Id.* at 415.  The certified mail receipt proved the notice telling her when

---

[33] The decision does not discuss why the agency chose to adopt the "good cause" standard as its test, rather than some other one.  But the agency had announced in an earlier adjudication that it would dismiss any appeal when a party failed to file a timely notice of appeal, appellate brief, or request for an extension (*Administration v. Hooper*, 6 N.T.S.B. 559 (1988)), and there was no proof that the agency enforced that policy inconsistently. *Gilbert*, 80 F.3d at 368.

any formal complaint was due had been delivered to her residence. The instruction in the letter was not crucial, however, for she was represented by a lawyer who should not have needed that prompting. *Id.* at 417. Because she missed multiple deadlines, each of which were dispositive, her claim was dismissed.

These Respondents had written instructions on how to request a hearing in the Determination Notice, and had legal counsel within the organization, who eventually responded on their behalf. They failed to act diligently when they waited for eight days to serve their response to a notice that required action within seven days of the date it had been issued.

H.    *These Facts Fail to Qualify for Equitable Tolling*

Those who apply for temporary foreign agricultural labor certifications move in an environment of short deadlines for the applicant and the agency. The applicant's business practices must accommodate the 5-day response times available to modify a certification application. The Administrator's Determination Notice was properly addressed to familiar agency customers that employ experienced staff counsel, and instructed the Respondents on how to request a hearing. They recently and successfully had requested a hearing on another debarment matter (the Hawaii debarment proceeding) in a timely fashion. Delivering the Determination Notice by certified mail emphasized that it required prompt attention.

The arrival of the Determination Notice on the last day to request a hearing was an extraordinary circumstance justifying a prompt request to extend the time to serve the Respondents' request for a *de novo* hearing. No evidence had to be gathered or arguments developed; it was enough for the Respondents to write a letter identifying themselves, ask for a hearing, date it, sign it and mail or even fax it. It easily could have accompanied any motion to extend their time to request a hearing. But the Respondents neither requested an extension nor acknowledged that they filed their hearing request late. Even if they thought they had seven days from the date they received the Determination Notice – something inconsistent with the notice itself, and 20 C.F.R. § 655.110(a) – their response was untimely.

The Respondents have failed to offer any satisfactory explanation for their delay in responding to the notice. Their declarations struggle to put the best face on their negligence. After eight days they realized they needed to reply, and sent their response, when it was too late. AR 1. The facts required to qualify for equitable tolling are absent. The Administrator did nothing to mislead them, no extraordinary circumstance kept them from replying to the Determination Notice until eight days after they received it, and they had not filed their hearing request on time in some wrong place. *Marshall, supra*, 657 F.2d at 18; *see also Baldwin County Welcome Ctr. v. Brown*, 446 U.S. 147, 151 (1984) (dismissing the Title VII action a that *pro se* party attempted to initiate by filing her "right to sue" letter in district court. She had been informed several times of the date her complaint had to be filed, but she failed to follow those instructions. The Court held she was not entitled to equitable tolling because she failed to exercise due diligence).

### I.        Proportionality

Dismissal is a harsh result, but no more so than the results in *Baldwin County Welcome Center*[34] and *Johnson v. Henderson*,[35] where the plaintiffs lost their opportunity to present Title VII claims; in *Universal City Studios*,[36] where the copyright holders lost their annual share in the common royalty fund; in *Gilbert v. NTSB*,[37] where the pilot lost his opportunity to appeal his license suspension; in the many cases where litigants lost their right to review by the Administrative Review Board due to their delay in filing petitions for review; or in *Mike Langley Farms, Inc.*[38] where farmer lost the opportunity to use temporary foreign agricultural workers.

## ORDER

The request for hearing is dismissed.  This dismissal makes the Department's July 27, 2006 Determination and Notice of Prospective Denial of Temporary Alien Agricultural Labor Certification for Three Years the Secretary of Labor's final order.

# A

William Dorsey
Administrative Law Judge

**Notice**: This Decision and Order constitutes the final order of the Secretary of Labor.  20 C.F.R. § 655.112(b)(2) (2006).

---

[34] 466 U.S. 147, 151 (1984).

[35] *Johnson v. Henderson*, 314 F.3d 409 (9th Cir. 2002).

[36] *Universal Studios, LLP v. Peters*, 402 F.3d 1238 (D.C. Cir. 2005).

[37] *Gilbert v. NTSB*, 80 F.3d 364 (9th Cir. 1996).

[38] *Mike Langley Farms, Inc.*, 1999-TAE-001 (ALJ Nov. 13, 1998).

**U.S. Department of Labor**

Office of Administrative Law Judges
50 Fremont Street - Suite 2100
San Francisco, CA 94105

(415) 744-6577
(415) 744-6569 (FAX)



**Issue Date: 26 December 2006**

Case No.: 2006-TLC-00013

*In the Matter of:*

GLOBAL HORIZONS, INC.,
GLOBAL HORIZONS MANPOWER, INC., and
MORDECHAI ORIAN, an individual,

RESPONDENTS.

*Appearances*:

> Vincent C. Costantino, Esquire
> Office of the Solicitor of Labor
> For the Administrator, Office of Foreign Labor Certification
>
> Mindy S. Novik, Esquire
> Dean A. Rocco, Esquire
> Jackson Lewis LLP
> For the Respondents

Before:    WILLIAM DORSEY
           Administrative Law Judge

### Decision and Order Denying Respondents' Emergency Application for a Stay

The application the Respondents filed for an emergency stay of the Secretary of Labor's final debarment order entered on November 30, 2006, is treated as one made under Section 10(d) of the Administrative Procedure Act[1] (APA), 5 U.S.C.A. § 705 (West 1996).  The harm to the Respondents' business is counterbalanced by harm to the public interest if a stay is granted, so the stay is denied.

---

[1] Under the APA, "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." 5 U.S.C.A. § 705 (West 1996).

### A.    Background

This matter arose under the temporary alien agricultural labor portion of the Immigration and Nationality Act, 8 U.S.C.A. §§ 1101(a)(15)(H)(ii)(a), 1184(c)(1) and 1188(b)(2)(A) (West 2005), and the Secretary of Labor's implementing regulations published at 20 C.F.R. Part 655 (2006). The Respondents' business provides foreign workers for American farms, after obtaining certifications from the Secretary of Labor that there are not enough workers in the United States who are able, willing, qualified and available at the time and place needed to perform that agricultural labor. 8 U.S.C.A. §§1101 (a)(15)(H)(ii)(a), 1184(a) (West 2005); 20 C.F.R. § 655.90(b)(1) (2006). They use the Secretary's certifications to obtain H-2A visas from immigration authorities that allow workers to enter the United States as nonimmigrants to perform seasonal or temporary agricultural work. The Administrator of the Department of Labor's Office of Foreign Labor Certification, Employment and Training Administration (the Administrator), who reviews H-2A certification applications, has the authority to debar employers who "substantially violate" the program's requirements. 20 C.F.R. §§ 655.92 & 655.110 (a) & (b).

On July 27, 2006, the Administrator determined that the Respondents made fraudulent and willful misrepresentations in an application that had been approved, a substantial violation under 20 C.F.R. § 655.110(g)(1)(i)(E). He served them with a notice debarring them from submitting temporary alien agricultural labor certification applications for three years.

The Respondents requested *de novo* review of their debarment on August 11, 2006. 8 U.S.C.A. § 1188(e); 20 C.F.R. § 655.110(a) (offering applicants for certification the opportunity to request an expedited administrative review of a determination within seven calendar days of the date of the Administrator's notice). A Decision and Order issued on November 30, 2006 (the Dismissal) found that the Respondents' hearing request was untimely and failed to qualify for equitable tolling. The Administrator's July 27, 2006 debarment became the Secretary of Labor's final order. The Administrator thereafter denied four H-2A certification applications from the Respondents that were pending when the Dismissal was issued, and any others they file likely will be denied on the same basis.

On December 8, 2006, the Respondents applied for a stay of the Dismissal under Rule 62, Federal Rules of Civil Procedure (F.R.Civ.P.). Declarations were filed supporting the application from the Respondents' attorney, Dean A. Rocco, with exhibits A-C (Rocco Exs. A-C) and from the individual Respondent, Mordechai Orian, who is also President of the two corporate Respondents, with exhibits A-E (Orian Exs. A-E). They specified the harm the Respondents' business would suffer unless the debarment were stayed, as well as difficulties the debarment would cause their customers and H-2A employees.

A district court may suspend, modify, or restore an injunction it has issued while an appeal is pending. *See* Rule 62(c), F.R.Civ.P.[2]  That rule does not apply to matters pending

---

[2] The Rules of Practice and Procedure for Administrative Hearings Before the Office of Administrative Law Judges say that in situations not covered by those rules "or any statute," the Rules of Civil Procedure for the District Courts of the United States apply. 29 C.F.R. §§18.1 and 18.29(a)(8) (2006). The statutory provision on stays pending review at 5 U.S.C.A. § 705 obviates resort to Rule 62, F.R.Civ.P.

before the Secretary of Labor, an executive officer with no inherent equity powers. The APA authorizes agencies to stay their final orders when "justice so requires." 5 U.S.C.A. § 705, quoted in footnote 1 above. That section of the APA also authorizes a reviewing Article III court to stay an agency's final order pending its review.[3] Rule 18(a), Federal Rules of Appellate Procedure (F.R.App.P.) describes how appellate courts exercise that power. C.A. Wright, A.R. Miller, E.H. Cooper, 16A FED. PRAC & PROC. Juris.3d § 3964 (2006 Supp.)

> B.   *The Factors the Secretary Considers When Evaluating a Stay Application*

In deciding whether to stay a final order while an Article III courts reviews it, the Secretary of Labor evaluates: 1) the likelihood that the moving party will succeed on the merits of the request for review; 2) whether the moving party will be irreparably injured absent a stay; 3) the prospect that others will be harmed if the stay is granted; and 4) where the public interest lies. *Welch v. Cardinal Bankshares Corp.*, ARB No. 06-062, ALJ Case No. 2003-SOX-15 (ARB June 9, 2006) (Order Denying Stay); *Cefalu v. Roadway Express Inc.*, ARB Nos. 04-103, 04-161, ALJ No. 2003-STA-55, slip op. at 2 (ARB May 12, 2006) (Order Denying Stay); *Office of Fed. Contract Compliance Programs v. Univ. of North Carolina*, Case No. 84-OFC-20 (Sec'y April 25, 1989) (Order Denying Stay). Other federal agencies consider these factors as they resolve stay requests. *See e.g., In re: Station KDEW (AM), Dewitt, Arkansas*, 11 F.C.C.R. 13,683, 1996 WL 591011 (FCC Oct. 16, 1996); *Briggs v. Nat. Council on Disability*, 68 M.S.P.R. 296; 299 (MSPB July 25, 1995) (denying the employing agency's stay request); *In the Matter of the Applications of Timpinaro, et al.*, 50 S.E.C. Docket 238, 1991 WL 288326 at *2 (SEC Nov. 12, 1991) (Order Denying Stay).

The factors obviously have been derived from those that the federal district courts apply when they rule on applications for preliminary injunctions, and on motions for a stay pending appeal under Rule 62(c), F.R.Civ.P., and that the courts of appeals apply under Rule 18(a), F.R.App.P. The courts of appeals relied on them in ruling on requests to stay agency orders in *State of Ohio ex rel. Celebrezze v. NRC*, 812 F.2d 288 (6th Cir. 1987) (staying an order of the NRC that granted a nuclear power plant a full power operating license); and in *Associated Securities Corp. v. SEC*, 283 F.2d 773 (10th Cir. 1960) (declining to stay SEC orders that excluded individuals and entities from the securities business because protection of the investing public outweighed the detriment they suffered).

---

[3] After the language quoted in footnote 1, Section 10(d) of the APA goes on to say that:

> "On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C.A. § 705 (West 1996).

During the December 15, 2006, telephonic conference to set the time for the Department to respond to the stay application, the Respondents stated they intended to seek review and apply for a stay in an appropriate federal court if the Secretary did not stay the Dismissal.

1.    <u>Irreparable Harm to the Respondents</u>

The Respondents insist that to deny a stay pending judicial review amounts to a "corporate death penalty." They function as a sort of labor broker, linking farm workers with American farmers. They are more than brokers, however, for they become the workers' employer, and contract their labor out to farmers. The Respondents project gross revenue of $11 million from their work during 2006. Orian Declaration at ¶ 5. Mr. Orian says that if the Dismissal order makes the debarment immediately effective, the Respondents "will not be able to recruit and hire local or foreign workers. . . ." Orian Declaration at ¶ 21.

There is some hyperbole here. The debarment prevents the Respondents from applying to the Administrator for the certification required to obtain H-2A visas to admit aliens to the United States as temporary or seasonal workers. The Respondents remain free to recruit domestic, or what the Orian declaration calls "local" workers. I infer that the majority of the workers the Respondents employ are aliens who enter the United States on H-2A visas, because Mr. Orian emphasizes in ¶ 3 of his declaration that the farmers who are his clients "avoid the costs associated with the . . . H-2A program," but the declaration ought to be more specific. Enough domestic workers might be recruited to maintain the Respondents' business at some lower level of gross revenue, but the tenor of Mr. Orian's declaration leads me to doubt that the business would be viable in the long term.

The H-2A visa program admits aliens only for periods of less than one year; jobs that last twelve months or more are presumed to be permanent, so H-2A workers cannot fill them. 8 U.S.C.A. § 1101(a)(15)(H)(ii)(a); 20 C.F.R. §§ 655.100(c)(2), 655.101(g); *Kentucky Tennessee Growers Association, Inc.*, 1998-TLC-1, slip op. at 5 & text accompanying footnote 8 (ALJ Dec. 16, 1997) (explaining that nine month's employment is a red flag for further inquiry into whether a job is "temporary," but it may qualify for the H-2A program). A separate program with more rigorous standards apply to certifications of aliens to work in permanent jobs in the United States. 8 U.S.C.A. §1182(a)(5)(A) (West 2005) and 20 C.F.R. Part 656 (2006).

The three-year debarment necessarily forces the Respondents to progressively wind down the H-2A aspects of their business in the first year and precludes those operations for the next two years. The debarment currently prevents them from filling jobs encompassed in the four certification applications pending before the Administrator on November 30, 2006,[4] as well as jobs encompassed by additional certification applications the Respondents intend to file.[5] Without the ability to obtain new H-2A business, in time they eventually will have to lay off 25 corporate employees (22 in its Santa Monica, California headquarters and one each in the states of Florida, Hawaii and Washington).

---

[4] These included 15 jobs harvesting corn and soybeans for Pioneer Hi-Bred International Inc. in Hawaii; 30 jobs harvesting mushrooms for Creekside–Sno Top in Pennsylvania; 8 jobs harvesting flowers and cabbage for Monden Farms, LLC in Hawaii and 2 jobs harvesting coffee for Grassman Farms in Hawaii. Orian Declaration at ¶¶ 11–14.

[5] These include 9 jobs harvesting flowers for Kula Farms in Hawaii; 5 jobs harvesting gourds for Good Harvest in Pennsylvania; 4 jobs harvesting flowers for Howard's Nursery in Hawaii; 8 jobs harvesting corn and soybeans for Pioneer Hi-Bred International, Inc. in Hawaii and 10 jobs harvesting gourds and vegetables for Cedar Meadow in Pennsylvania. Orian Declaration at ¶ 18.

Mr. Orian says in his declaration that the Dismissal and debarment will cause the Respondents to lay off the agricultural laborers they hired,[6] but I do not understand why they should. The Administrator neither voided nor interfered with contracts the Respondents negotiated with farmers and farm workers already admitted to the country on H-2A visas. The farm workers may continue their agricultural work, and farmers may continue to pay the Respondents for that labor. Out of the farmers' payments the Respondents would continue to pay the farm workers' wages and provide their other benefits (including workers' compensation insurance, housing and transportation) over the course of the agricultural season they were hired to work. Present jobs are not at risk, assuming that the Respondents negotiated contracts that earn a profit, or at least cover their costs.

The Respondents also assert that they will be forced to break the lease for their headquarters, which expires in July of 2009 and costs $12,932.59 per month, because it will no longer be able to do any business. Orian Declaration at ¶¶ 8 & 10. They remain liable to pay for their current H-2A workers' living quarters in Florida, Utah, Colorado, Pennsylvania, New York Hawaii and California, and rent for a storage unit in Los Angeles that together cost $27,280.09 per month. Id. at ¶ 9.

It is impossible to predict how long the review proceedings will take, but as they go on, the Respondents' existing labor contracts cannot be replaced using foreign workers unless a stay is granted. Because I do not know the portion of foreign workers the Respondents currently hire, or how readily they may substitute domestic workers for them, I do not know how long their business may be viable. The Administrator argues that the Respondents should be able to increase their reliance on domestic workers, because unemployment among farm workers was about double the unemployment rate for all occupations in 2003, the last year for which data was available in the economic report he offered, entitled "Farm Labor Shortages and Immigration Policy."[7] Administrator's Ex. 2, Table 2 at pg. CRS-11. But the report acknowledges that there may be "farm labor shortages in certain areas of the country at various times of the year." Id. at pg. CRS-8; see also pg. CRS-16. Those spot shortages appear to be exactly what the H-2A visa program was meant to ameliorate. The Administrator also points out that hiring in U.S. farms and ranches was down 5% on a year to year basis for the week of October 8–14, 2006 according to a Nov. 17, 2006 report of the National Agricultural Statistics Service of the U.S. Department of Agriculture. Administrator's Ex. 2 at pg. 1. This single week's data says nothing about the availability of labor in specific areas of the country at the times crops must be harvested.

While the evidence on this factor is less specific than it ought to be, on balance it weighs in favor of a stay. See In Re Hayes Microcomputer Products, Inc., 766 F.Supp. 818, 823 (N.D. Cal. 1991) (staying injunctive relief in a patent infringement action conditioned on the quarterly deposit by the defendants of royalties in an insured bank account while the appeal remained pending); U.S. v. TGR Corp., 1998 WL 846746 (D. Conn.) at *3 (staying civil disabilities under

---

[6] Orian Declaration at ¶ 10.

[7] L. Levine, FARM LABOR SHORTAGES AND IMMIGRATION POLICY, Congressional Research Service (Feb. 22, 2005).

Rule 38(g), Federal Rules of Criminal Procedure,[8] after TGR Corp. was convicted of violating the Clean Water Act[9] which otherwise would disqualify it from all government procurement opportunities[10] during the appeal of the conviction to the Second Circuit).

The Respondents' hardship must be evaluated in tandem with the likelihood of their success on the merits. As hardship increases, likely success recedes but does not disappear from the calculus. *Washington Metro. Area Transit Comm. v. Holiday Tours*, 559 F.2d 841 (D.C. Cir 1977) (upholding the district court's decision to continue the *status quo* pending appeal, which allowed a motor coach sightseeing service to carry on without a certificate of public convenience while it appealed a permanent injunction against its unregulated operation); *Harper v. Poway Unified School Dist.*, 445 F.3d 1166, 1174 (9th Cir. 2006) (recognizing the inverse relationship of hardship and likelihood of success).

> 2.    The Likelihood That the Respondents will Succeed on the Merits in the
>           Review Proceeding

The probability of success is not approached mathematically. The Respondents need not demonstrate that there is a greater than 50% likelihood that the Dismissal will be reversed or remanded. *Cuomo v. U.S. Nuclear Regulatory Comm.*, 772 F.2d 972, 974 (D.C. Cir. 1985). The movant's burden, as Judge Frank characterized it, is to show that questions going to the merits of the dispute "are so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberative investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2nd Cir. 1953) (upholding a preliminary injunction that forbade a company that had purchased a competitor's stock from voting that stock, pending a trial on the merits of a Clayton Act antitrust claim).

The issues to be presented to an Article III court include whether the procedures set out in 20 C.F.R. § 655.110 and 655.112 are facially vague and lack clarity because their text does not identify the standard the Secretary will apply in deciding whether to accept a late hearing request. Respondents' Stay Application at 10. Decisions of the U.S. Supreme Court establish that the Secretary is free to choose any combination of rulemaking and case-by-case adjudication as she administers the programs Congress entrusted to her. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974); *SEC v. Chenery Corp.*, 332 U.S. 194, 202-203 (1947). Whether the Secretary has the discretion to determine the consequences of failing to file a timely hearing request through an individual adjudication rather than through rulemaking would not present a reviewing court with a difficult or doubtful question.

---

[8] The process to stay disabilities in criminal cases such as *TRG Corp.* is a different one, as the Sixth Circuit pointed out in *State of Ohio ex rel. Celebrezze, supra*, 812 F.2d at 291.

[9] 33 U.S.C.A. § 1319(c)(2) (West 2001).

[10] These included the Clean Water Act's prohibition against awarding any federal contracts, loans or benefits to an entity convicted of violating the Clean Water Act (33 U.S.C. § 1368), and the government-wide debarment and suspension regulations of the Office of Federal Procurement Policy that the Environmental Protection Agency had adopted at 40 C.F.R. § 32.415(a). *TGR Corp, supra*, 1998 WL 846746 at *3.

The Respondents also will argue that the Dismissal is arbitrary and capricious, and exceeds the Secretary's statutory jurisdiction. Respondents' Stay Application at 10. Challenges to rules themselves have a limited probability of success, given the high degree of deference Article III courts accord to agency procedures and statutory interpretations when Congress has left a gap for the agency to fill, and the agency has engaged in notice and comment rulemaking. *United States v. Mead Corp,* 533 U.S. 218, 227 (2001); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837 (1984). The claim that the Dismissal was an arbitrary or capricious action triggers  review that is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *See Independent Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotations omitted); *Center for Biological Diversity v. U.S. Fish & Wildlife Service,* 450 F.3d 930, 934 (9th Cir. 2006); *Irvine Medical Ctr. v. Thompson,* 275 F.3d 823, 830-31 (9th Cir. 2002) (explaining the deference owed to an agency decision).

There was no dispute about the two core facts—the date the Administrator sent the debarment notice and the date the Respondents sent the Administrator their request for hearing. To contend that the Dismissal is premised on facts not in evidence, without identifying the crucial missing fact(s), provides nothing to weigh or evaluate on this factor.

The law on the standards to qualify for equitable tolling is well established both in the Secretary's decisions, and in the Article III courts. The application of the admitted facts to that body of law presents no unusual or difficult issue.

Looking deeper into the Respondents' Stay Application, the Rocco declaration states that the review request "will raise several novel legal issues including *inter alia* this Court's analysis of the facts and legal issues surrounding Respondents' request for *de novo* review and the legality and constitutionality of the debarment process set forth in 20 C.F.R. § §§ 655.110 and 655.112." *Id.* at ¶ 7. The SEC was not persuaded to stay its final order by those barred from the securities industry while an Article III court considered their allegations the agency's rules were "discriminatory, anti-competitive and unconstitutional." *In the Matter of the Applications of Timpinaro, et al., supra,* 1991 WL 288326 at *6. Without greater specificity, a citation to controlling legal authority that the Dismissal decision failed to heed, or the identification of a specific legal issue of first impression that will be presented for review,[11] as the district court did in *General Teamsters Union Local 439 v. Sunrise Sanitation Services Inc.,* 2006 WL 2091947 at *3 (E.D. Cal 2006), the Respondents have not framed "serious, substantial, difficult and doubtful" questions.

The Respondents have not shown a probability of success on review. I do not believe, on the other hand, that the review request they have described would be frivolous, *i.e.,* an appeal so meritless that its result is foreordained. *See Jimenez v. Madison Area Tech. Coll.,* 321 F.3d 652, 658 (7th Cir. 2003) (applying that definition of "frivolous" in the context of Rule 38,

---

[11] The district court identified the issue "whether presenting employees with a Hobson's choice between their interest in securing new representation and preserving their existing CBA is consistent with national labor policy" as "a matter of first impression in this circuit," after it had found the chance of success on another issue the movant raised "entirely speculative." *Sunrise Sanitation Services Inc., supra,* 2006 WL 2091947 at *3.

F.R.App.P.).

Based on the allegations in the Respondents' Stay Application and the supporting declaration, this factor does not weigh in favor of a stay.

3.    Substantial injury to others

The Respondents are correct that the Administrator himself suffers no prejudice from judicial review, or from the task of reviewing additional certification applications the Respondents may submit.

The Respondents allege the farmers and workers will suffer if the debarment remains in effect, for they are a labor provider "unlike almost any other in the country" because they employ the foreign workers. Orian Declaration at ¶ 3. Their clients avoid liabilities that result from an employment relationship and the costs of the H-2A program, which include application fees, immigration, travel and housing expenses, legal services, worker's compensation insurance, payroll, and benefits administration and local state and federal administrative scrutiny. *Id.* The Respondents are adamant that their services are needed because their client farmers regularly require their assistance to obtain labor in the specific way they structure the transaction.

The Orian declaration never says the Respondents achieve any unique or unusual economies of scale in their contracts. Whatever benefit farmers may accrue from the way the Respondents do business, the fees paid to the Department for the certification, and the H-2A workers' travel, housing, transportation, insurance, payroll or benefits costs don't disappear; the price farmers pay the Respondents must cover them all. No evidence shows that farmers would incur additional costs if they were to be the employer for the H-2A workers who harvest their crops.

Mr. Steve Groff, a Pennsylvania farmer and one of the Respondents' clients, did not "pretend to know why a judge would [debar the Respondents]." Orian Ex. E. Nonetheless, he believes that if the Respondents "were not able to continue to provide these necessary workers which we can't get from anywhere else, it would have extremely devastating consequences, not just for me, my farm and my family, but for the countless growers in the U.S. who continue to face every day an uphill battle getting their harvests picked while honoring the laws of the land." *Id.* I accept that Mr. Groff may not have another ready source of foreign workers if he cannot use the Respondents' services, and may find himself in a difficult situation. This is not adequate evidence to extrapolate, as Mr. Groff does, that "devastating consequences" would follow for "countless growers in the United States" if the Respondents are barred from submitting temporary alien agricultural labor certification applications. Inferences so broad cannot be drawn from a single data point.

Data from government reports that the Administrator provided in his opposition to the application for an emergency stay show that during the week of October 8–14, 2006 total employment on American farms and ranches was 1,077,000.[12] The Administrator certified about

---

[12] See the Nov. 17, 2006 report of the National Agricultural Statistics Service of the U.S. Department of Agriculture for the week of October 8–14, 2006. Administrator's Ex. 2 at pg. 1.

59,000 nonimmigrants as H-2A workers in fiscal year 2006, who were employed by 6,551 employers.[13] Nothing in the Respondents' declarations indicates that their withdrawal from the market that provides farmers with H-2A workers would have an appreciable effect on the labor supply available to American agriculture.

The Respondents offer a statement by Mr. Erik Nicholson of the United Farm Workers Association, AFL-CIO, about why the Respondents' services are necessary to H-2A workers. Orian Ex. D. Mr. Nicholson explained that if the Respondents lay off the 200 unionized H-2A workers they employ nationwide, farmers will not be able to complete their harvests. The workers will lose valuable protections provided in the UFWA's collective bargaining agreement with the Respondents that guarantee workers' wages and seniority rights. *Id.* As pointed out earlier, nothing about the Administrator's notice or the Dismissal interferes with existing contracts the Respondents have with farmers or with domestic or foreign agricultural laborers. There is no reason to believe that fewer H-2A workers will be hired in the United States over the next three years if the Respondents are not their employer. Whether future workers would toil in jobs covered by a collective bargaining agreement cannot be known today.

The harms to unionized workers and to farmers that Mssrs. Nicholson and Groff describe are essentially restatements of the harm to the Respondents' business. They represent double counting if they are separately weighed as part of the "injury to others" factor after they have been considered in assessing "irreparable harm."

On the whole, this factor adds little to the analysis. The Respondents have failed to show that more harm would come to third parties if the debarment remains in effect that if it were to be stayed.

### 4.   The Public Interest

The stay requested would not maintain the *status quo ante*. The Respondents' existing contracts are unaffected by the Dismissal; they require no stay to be completed. The Respondents seek something more—to obtain other certifications from the Administrator, that will lead the immigration authorities issue additional H-2A visas to foreign workers. Those H-2A applications require attestations from whoever serves as the employer, detailing how that employer will meet its obligations to provide the minimum benefits the regulations prescribe to this new population of vulnerable temporary foreign employees. 20 C.F.R. § 655.101(b)(1), (2); 655.102(b); 655.103.

The Administrator's findings in his July 27, 2006 debarment notice became final when the Respondents failed to seek timely review. The Administrator's investigation found that the Respondents willfully misrepresented in an approved certification application that they had contracts for 200 jobs with Taft Vegetable Farms when they did not, and falsified the reasons the H-2A workers were terminated (for poor performance) when they actually fired them because

---

[13] Draft H-2A Temporary Agricultural Program Statistical Yearbook for Fiscal Year 2006, Employment and Training Administration, U.S. Dept. of Labor (Dec. 2006). Administrator's Ex. 3 at pg. 3.

the Respondents could not find them work.  No farmers were damaged in that situation precisely because none had contracted with the Respondents for those workers, but the H-2A workers suffered when they were fired.

The Administrator now has reason to doubt the Respondents' honesty; their certification applications no longer can be taken at face value.[14]  It is not in the public interest to continue to certify additional applications, while review proceeding are pending, from entities that investigation has shown are untrustworthy. *See* the SEC's analysis in *In the Matter of the Applications of Timpinaro, et al., supra,* 1991 WL 288326 at *6 (discussing the negative effect on securities markets if stays were granted pending judicial review); *Associated Securities Corp. v. SEC,* 283 F.2d 773 (10th Cir. 1960).

### C.    Conclusion

The Respondents have made an adequate showing that they stand to suffer irreparable injury to their business if the debarment becomes immediately effective.  The Administrator's findings, which have become established as a consequence of the failure to make a timely hearing request, show serious misconduct that harmed past H-2A workers, that reflects adversely on the Respondents' honesty.  They have not shown that they are likely to prevail on the merits in their proceeding to review the Secretary's final order, nor that third parties are likely to suffer unduly unless the stay is granted.  The balance of the equities does not tip in the Respondents' favor.

### Order

The Respondents application for an emergency stay of the Secretary of Labor's final debarment order entered on November 30, 2006 is denied.

# A

William Dorsey
Administrative Law Judge

---

[14] The hyperbole in the Orian declaration does nothing to dispel this concern.

10

# Exhibit C

 

GLOBAL THINKING FOR DOMESTIC PRODUCTION

A Division of Global Horizons, Inc.

About Us
Hot Top Picks
Resources
Glossary
FAQs
Photo Gallery NEW
Jobs NEW
Events NEW
Contact Us







## FAQs

**Q: Is it true there's a widespread shortage of housing for migrant farm workers?**

**A:** Yes. Up until the late 1960's, there was an ample supply of farm labor camps and housing in general. Following the rise of farm labor activists like Cesar Chavez, one of the strategies employed as a response was to "bulldoze" most such camps, in order to wipe out the resistance to the movement. There's been a shortage ever since in almost all parts of the country.

**Q: What impact has this had on grower's making use of the U.S. Government H2A Program?**

**A:** It has had a *significant* impact. The H2A "Guest Worker" Program is a viable alternative to the risky use of illegal aliens, and the substandard labor they most often provide. Since one of the requirements for growers who ordinarily would jump at the chance to try the program is to provide housing ( with all the Department of Labor and OSHA requirements and cumbersome paperwork that goes with it) as part of the process for getting certification for use of guest farm workers, many growers who could really benefit from use of the program have stayed away from doing so.

**Q: Can GLOBAL HORIZONS, INC. make it easy for me to benefit from use of "H2A"?**

**A:** Absolutely! GLOBAL HORIZONS 's team includes agricultural economists and other experts who have assisted many businesses and associations in the successful use of the U.S. "Guest Worker" Program. By administrating all the paperwork themselves, GLOBAL goes through the certification process, finds, hires and brings into the USA the workers you need to do the job you require.

**Q: What about the housing problem? We have virtually no housing anywhere near our farm? Can you help us solve that problem?**

**A:** Yes. GLOBAL HORIZONS, INC. is a forward thinking Manpower organization and farm labor contractor that is ready to bring you the quality farm labor you need, and since we are also a State licensed and Federally certified farm labor contractor, we are ready to oversee and supervise the laborers who will be working on your land, from the beginning of the season on through to your harvest.

**Q: How can you solve the lack of housing problem for us?**

**A:** GLOBAL is the *first and only* manpower organization and farm labor contractor in the history of U.S. farming to utilize and bring to the grower's land safe, and economical alternative housing which can erected in a matter of hours. Such housing meets all the requirements of 1910 OSHA standards, as well as the Universal Building Code, the Standard Building Code and the B.O.C.A Code. It will meet all DOL requirements, and State Building and Safety Requirements.

**Q: What kind of alternative housing solution will you be providing us?**

**A:** GLOBAL has teamed up with one of the top manufacturers in the world of what are commonly known as "Geodesic Domes". Such domes are economical, rapidly constructed, energy efficient, and low maintenance. You've seen such domes in many modern structures such as Disney's Epcot, the Astrodome, and possibly your neighborhood gym or auditorium. But GLOBAL is *the first* in history to bring the advantages of domes to the farm industry, adopting them for use as portable labor camp living accommodations.

**Q: How will that work?**

**A:** Extremely well. Once we have discovered your requirements, and come out to look at your land, we will determine the specific number of modular units, including bathroom and shower facilities, required based on the number of workers with which we will be providing you. Together, we will decide precisely where the domes will be put up (they can usually be put up in one day), coordinated, of course, with the availability of water, electricity and waste removal.

**Q: How can I find out more about working with GLOBAL HORIZONS for my upcoming season?**

**A:** Easy! Simply give us a call at 310-234-8475, X100 and we will be happy to answer all your questions, find out more about what you need and how we can assist you in having your most profitable and worry-free season ever.

Copyright ©2002 Agrilabor is a Division of Global Horizons, Inc. All Rights Reserved

℅JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Circle Four LLC and Central Plains Farms, LLC | See Exhibit A |

FILED
U.S. DISTRICT COURT

**(b)** County of Residence of First Listed Plaintiff   Beaver and Iron
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

2007 MAY 15 P 3: 07

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

DISTRICT OF UTAH

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Frederick R. Thaler, Jacquelyn Rogers, Ray Quinney & Nebeker P.C., 36 South State Street, Suite 1400, Salt Lake City, Utah 8411, (801) 323.3358

Attorneys (If Known)

BY:
DEPUTY CLERK

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332, 1335, 1397, 2361

Brief description of cause:
interpleader, breach of contract, fraud, negligent misrepresentation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ Greater than $250,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   5/15/07

SIGNATURE OF ATTORNEY OF RECORD   Jacquelyn Rogers

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Case: 2:07cv00320
Assigned To : Stewart, Ted
Assign. Date : 5/15/2007
Description: Circle Four et al v. Orian et al

## Exhibit A

### Defendants

Mordechai Orian A/K/A Motty Orian, Global Horizons, Inc. D/B/A Agrilabor, Pongsatorn Sanaruk, Phongsak Kununtha, Phanuphong Wongworn, Phanom Mongkhonsawat, Prawet Phannarit, Somphong Sriyap, Somsak Wongkaeo, Wichai Charoen, Mechai Sawong, Prayad Bunprom, Sayan Chuaytua, Ekachai Pariwantang, Yotrak Phothip, Thanit Sriboran, Somsak Phromkhan, Chaloemchai Phothiworn, Narong Srinongkhot, Somsak Khaephutcha, Supphasit Yasaka, Manja Khuntha, Narongchai Khumbungkla, Thaichan Kongtungmon, Phanuwat Jomthip, Arun Phanpon, Arwuth Lainok, Chakkapong Laebua, Suwit Mikeao, Anurat Truatnok, Prasit Sri-On, Watthana Kajik, Praphan Matad, Uthan Khlongdee, Phirom Krinsoongnoen, Amnuay Phakonchim, Phirawat Nuanbunma, Pheeraphong Saisong, Dechawat Vongtar, Chaiyakon Prachot, Thongphai Nuanngam,   Bunthai Sareewong, Chuangchot Muad-Otton, Monghonsak Thanakhun, Samrit Korbpimai, Chairat Srinakrung, Radchawee Suwansing, Panid Tharuppachit, Saharat Prasertsang, Waiyakorn Chianwapi, Prateep Apichateskol, Changchum Thanongsak, Ampai Apichateskol, Thaweewan Techo, Thian Pota, Seksan Sommanat, Phaibun Manisaeng, Anont Yingthavorn, Saiam Rodphan, Thanapat Piedaeng, Anu Khonsinit, Amornthep Thapjang, Prayoon Hongsamanut, Thanokorn Phiadoeng, Anthom Suphom, Prayut Chaipayant, Somchai Iamsa-Ard and Phichet Phanthasri

### Attorneys

Plaintiffs believe that Alex McBean, Legal Services of Utah, 205 North 400 West, Salt Lake City, Utah 84103 represents the following Defendants:   Pongsatorn Sanaruk, Phongsak Kununtha, Phanuphong Wongworn, Phanom Mongkhonsawat, Prawet Phannarit, Somphong Sriyap, Somsak Wongkaeo, Wichai Charoen, Mechai Sawong, Prayad Bunprom, Sayan Chuaytua, Ekachai Pariwantang, Yotrak Phothip, Thanit Sriboran, Somsak Phromkhan, Chaloemchai Phothiworn, Narong Srinongkhot, Somsak Khaephutcha, Supphasit Yasaka, Manja Khuntha, Narongchai Khumbungkla, Thaichan Kongtungmon, Phanuwat Jomthip, Arun Phanpon, Arwuth Lainok, Chakkapong Laebua, Suwit Mikeao, Anurat Truatnok, Prasit Sri-On, Watthana Kajik, Praphan Matad, Uthan Khlongdee, Phirom Krinsoongnoen, Amnuay Phakonchim, Phirawat Nuanbunma, Pheeraphong Saisong, Dechawat Vongtar, Chaiyakon Prachot, Thongphai Nuanngam,   Bunthai Sareewong, Chuangchot Muad-Otton, Monghonsak Thanakhun, Samrit Korbpimai, Chairat Srinakrung, Radchawee Suwansing, Panid Tharuppachit, Saharat Prasertsang, and Waiyakorn Chianwapi.

Plaintiffs do not know who represents the other Defendants.